**GLOBE LIFE AND ACCIDENT INSURANCE COMPANY,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 99–747T.

United States Court of Federal Claims.

Oct. 9, 2002.

---

Peter H. Winslow, Scribner, Hall & Thompson, LLP, Washington, D.C., for the plaintiff. Thomas D. Sykes, Scribner, Hall & Thompson, LLP, Washington, D.C., of counsel.

Charles J. Crueger, Tax Division; Mildred L. Seidman, Chief, Court of Federal Claims Section; and Eileen J. O'Connor, Assistant Attorney General, United States Department of Justice, for defendant.

## OPINION

HORN, Judge.

The plaintiff in the above captioned suit, Globe Life and Accident Insurance Company (Globe), brought this action for the recovery of federal income taxes and related interest allegedly assessed erroneously and collected by the United States for the taxable year ending December 31, 1986. Globe asserts that it is entitled to amortization deductions for the loss of intangible assets pursuant to Internal Revenue Code (I.R.C.) § 167 (1980).[1] More specifically, Globe claims deductions relating to the loss of certain contractual relationships between it and its agents, collectively referred to by the plaintiff as the "agency force." Following trial, the court finds that Globe is not entitled to the amortization deductions claimed because it has failed to provide a reasonably accurate estimate of the useful life of its "agency force."

## FINDINGS OF FACT

The plaintiff was originally named NG Life Insurance of Delaware (NG Life). NG Life was formed in 1979 by Liberty Holding, a wholly owned subsidiary of Liberty National Life Insurance Company, for the purpose of acquiring the stock of a third corporation, Globe Life and Accident Insurance Company (Old Globe). Old Globe, a company distinct from the plaintiff in the instant case, was incorporated in 1951. On January 16, 1980, Liberty National Life Insurance Company entered into an agreement and plan of merger with Old Globe whereby NG Life would acquire Old Globe. By July 31, 1980, NG Life had acquired all of the outstanding stock of Old Globe. On December 31, 1980, Old Globe distributed all of its property to NG Life in a tax free liquidation under I.R.C. §§ 332 and 334. Immediately thereafter, NG Life changed its name to Globe Life and Accident Insurance Company, the current plaintiff.

At plaintiff's request, the Internal Revenue Service (IRS) issued a private letter ruling stating that, for federal income tax purposes, NG Life's acquisition and liquidation of Old Globe was to be treated as a purchase of Old Globe's property under I.R.C. § 334(b)(2). The purchase price for all of the stock of Old Globe acquired by NG Life was $201,852,497.00, the liabilities assumed were $212,152,675.00 and the interim earnings and profit with respect to the transaction were $17,985,031.00. Thus, for federal income tax purposes, the total amount to be allocated to the basis of Old Globe's property, as of December 31, 1980, was $431,990,203.00.

Plaintiff, in its original and amended federal income tax returns for the 1980 through 1986 tax years, elected to use the residual method in allocating basis under I.R.C. § 334(b)(2). Of the $431,990,203.00 to be allocated to the various assets acquired in connection with the stock acquisition and liquidation transactions, plaintiff initially allocated $246,623,491.00 to Old Globe's insurance-in-force (including a component for reserves under I.R.C. § 818(c)), and $185,366,712.00 to the basis of the assets listed on Old Globe's balance sheet. Plaintiff did not allocate any amount to Old Globe's trade name, goodwill, "agency force" or other intangible assets.

Based on its claim that the insurance-in-force asset had a basis of $246,623,491.00 as of December 31, 1980, plaintiff claimed deductions pursuant to I.R.C. § 167 in its federal income tax returns for amortization of the insurance-in-force asset. After auditing the returns, the IRS partially disallowed the insurance-in-force amortization deductions

---

1.  Unless otherwise noted, all citations to the Internal Revenue Code or Treasury Regulations are to those laws and regulations in effect in 1980.

and, by letter dated November 8, 1995, proposed to assess a deficiency against the plaintiff. Plaintiff challenged the disallowance and proposed deficiency to the IRS Appeals Office.

Following the appeal, the plaintiff and the IRS reached an agreement which was memorialized in a Form 870–AD. In the Form 870–AD, the plaintiff and the IRS agreed that the proper basis to be allocated to the insurance-in-force asset was $221,671,200.00, including the premium paid for the I.R.C. § 818(c) reserves, and the accident and health reserves. As a result of the agreement on the basis of the insurance-in-force asset, $24,952,291.00 of the purchase price remained unallocated, reflecting the difference between the total purchase price and the agreed upon value of Old Globe's assets, including the insurance-in-force. The IRS maintained that the $24,952,291.00 was properly allocable to goodwill, while plaintiff contended that the amount was properly allocable to an "agency force" asset. This issue was not resolved in the appeals process and plaintiff reserved the right to seek a refund or credit on the grounds that plaintiff was entitled to allocate a portion of the purchase price of the stock to the "agency force" asset and that plaintiff was entitled to amortize, deduct or otherwise recover the basis allocable to the "agency force" asset over its useful life, or as the relationships were terminated. Consequently, plaintiff filed a claim in this court.

Plaintiff alleges that: "Each of Globe's relationships with its agents is a separate intangible asset." The plaintiff states that "[t]he aggregation of these relationships is referred to as Globe's 'agency force.'" As of December 31, 1980, there were at least 804, and according to the plaintiff, as many as 941,[2] sales agents who were under contract to market Old Globe insurance products and who had previously sold at least one policy for Old Globe. The bulk of the agents were a part of Old Globe's Branch Office System. Fewer than 150 of those agents were under contract with Employee Benefits, a nation-wide general agent of Old Globe. Finally, approximately six of the general agents were under contract with Norm Huxman, another nation-wide general agent of Old Globe. Plaintiff's claim, however, concerns only the agents who were a part of Old Globe's Branch Office System and those who were under contract with Employee Benefits. It does not claim any amortization deductions for employees involved in the direct mail operations or for agents who sold insurance through the Customer Benefits Program.

In 1980, the Branch Office System covered thirty-seven states and consisted of fifty-four branch offices grouped geographically under the direction of five regional offices. Although some life insurance was sold through the branch offices, the main product sold was accident and health insurance, targeting elderly people above age sixty-five and rural, self-employed workers, such as farmers. Old Globe's Branch Office System was overseen by Old Globe's home office in Oklahoma City, Oklahoma, and all life, accident, and health insurance policies sold through that the Branch Office System were subject to home office approval. The home office's agency division, which supported the field sales effort, employed four to six people, not including regional managers and trainers.

The Branch Office System covered five regions, each headed by a regional manager who was hired by the home office. The regional manager was responsible for the sales effort of the branch offices within the region, including the administrative duties necessary to support those activities. The regional manager monitored the sales effort of the various branches, had sole authority to open new branch offices within the region, to hire or remove branch managers, and to assist branch managers in recruiting and training sales agents. Although they were authorized to do so, regional managers did not, typically, sell policies. Each regional manager could employ up to three trainers to assist branch managers in training new agents. Overall, Old Globe employed eight to ten trainers at any given time during 1980.

2. The parties have not been able to agree on the total number of agents under contract to market Old Globe insurance products as of December 31, 1980. The trial did not produce evidence as to an exact number.

Each of Old Globe's fifty-four branch offices was headed by a branch manager. A branch manager's main responsibility was the sales effort of the branch office, including the recruiting, training and supervision of sales agents, the full development of an agent's sales territory, and the administrative duties necessary to support those activities. Similar to regional managers, branch managers typically did not sell policies, although they were licensed and authorized to do so. Branch managers signed independent agent or career agent contracts setting forth the commissions they would receive for any policy they sold.

A branch office was normally divided into units, a typical unit having four to ten full time sales agents headed by a unit manager. The unit manager assisted the branch manager in the recruiting, training and supervising of sales agents and monitored the day-to-day sales effort. Unit managers signed independent agent contracts and also had an agreement with Old Globe that entitled them to overwrite (or override) commissions for each policy sold by an agent in their unit.

The sales agents in the Branch Office System were independent contractors compensated only on a commission basis. Sales personnel who elected to sell insurance exclusively for Old Globe as full-time agents signed an independent agent's contract or, before 1975, a career agent's contract. Old Globe's full time agents were not permitted to sell insurance for other insurance companies. The sales agents in the Branch Office System were responsible for finding customers. Old Globe did not use an institutional advertising strategy. Sales agents used door-to-door canvassing, telephone solicitation, and review of voter rolls and other public records, for example, to find customers. The branch offices also used a County Enrollment Program in which a branch or unit manager would select a locality to take advantage of its "economic peak," such as a wheat-producing area following a wheat harvest. The branch office would then run an

advertisement in a local area newspaper shortly before a team of agents would arrive in the locality. The team of sales agents, known as a "mobile unit," would spend a period of time in the locality selling Old Globe's insurance products. The agents paid their own expenses for the sales effort.

The second group of agents claimed by Globe as a part of its "agency force" involved an agreement between Old Globe and a partnership, Employee Benefits. In 1977, Old Globe entered into a General Agency Agreement with Employee Benefits whereby Employee Benefits would represent Old Globe exclusively in the federal civil service market to procure life insurance applications insuring the lives of regular, full time civil service workers employed by the federal government and members of their families. Under the General Agency Agreement, Old Globe paid Employee Benefits 115 percent of the first year premium, 15 percent of the second year premium, and progressively decreasing amounts thereafter. Employee Benefits had the exclusive right to sell Old Globe's product in the target market. As of December 31, 1980, Employee Benefits had contracts with approximately 100 to 150 agents to procure life insurance applications. Employee Benefits recruited and trained these agents who were compensated on a commission only basis.

## DISCUSSION

In a filing with the court following trial, the plaintiff concedes that: "Globe does not contend that the burden of proof shifted to defendant at any part in the proceedings." Pursuant to I.R.C. § 167(a), a taxpayer is "allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income." Treasury Regulation § 1.167(a)-3, as in effect at the time of NG Life's acquisition of Old Globe,[3] ex-

---

**3.** The addition of I.R.C. § 197, which was enacted by Congress in the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103-66, § 13261(a), 104 Stat. 1388, would appear to facilitate the resolution of disputes similar to the one currently before the court for intangible assets acquired after August 10, 1993, by permitting amortization deductions for "section 197 intangibles," including, among other assets, goodwill, going concern and workforce-in-place.

plained I.R.C. § 167 to include intangible objects:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

Treas. Reg. § 1.167(a)-3. Previously, cases often focused on whether a certain intangible asset was goodwill, defined as the expectancy of continued patronage. *See Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 554-55, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993) (quoting *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1247 (5th Cir.1973), *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974)). In *Newark Morning Ledger Co. v. United States*, however, the United States Supreme Court majority opinion held that:

> [I]f a taxpayer can prove with reasonable accuracy that an asset used in the trade or business or held for the production of income has a value that wastes over an ascertainable period of time, that asset is depreciable under § 167, regardless of the fact that its value is related to the expectancy of continued patronage. The significant question for purposes of depreciation is not whether the asset falls "within the core of the concept of goodwill," ... but whether the asset is capable of being valued and whether that value diminishes over time.

507 U.S. at 566, 113 S.Ct. 1670. The Court noted, however, that "we do not mean to imply that the taxpayer's burden of proof is insignificant. On the contrary, that burden often will prove too great to bear." *Id.* This is so even though the plaintiff need only prove the useful life and value of the asset in question with "reasonable accuracy." *Id.*

In determining whether an intangible asset had a limited life, the *Newark Morning Ledger* Court also referred to the mass-asset rule, which provides that:

> [C]ertain kinds of intangible assets are properly grouped and considered as a single entity; even though the individual components of the asset may expire or terminate over time, they are replaced by new components, thereby causing only minimal fluctuations and no measurable loss in the value of the whole .... The mass-asset rule prohibits the depreciation of certain customer-based intangibles because they constitute self-regenerating assets that may change but never waste.

507 U.S. at 557-58, 113 S.Ct. 1670.

■ The determination of whether the taxpayer has proven that an intangible may be amortized is a question of fact. *Id.* at 564, 113 S.Ct. 1670. Thus, to succeed on a claim for amortization deductions related to an intangible asset, the plaintiff must prove: (1) that the asset wastes over time, including that the asset is not a regenerating mass asset; (2) a reasonably accurate estimate of the period in which the asset wastes, meaning the asset's useful life; and (3) a reasonably accurate estimate of the value of the asset over its useful life. A taxpayer's failure to prove any of the three prongs is fatal to its claim.

■ The plaintiff argues that, through the evidence offered at trial, "Globe has met its burden to establish a reasonable approximation of the fair market value and the useful life of its agency force." Primarily, plaintiff bases its assertion that it has established the useful life and fair market value on the testimony and report of its expert witness, Richard Stebbins Miller. Plaintiff also alleges that the "agency force is not a 'mass asset' because [Old] Globe's relationships with its agents were maintained only through the substantial efforts of, and cost to, [Old] Globe."

The defendant presents a number of arguments in opposition to the plaintiff's claim. First, defendant argues that Mr. Miller is

unqualified under Federal Rule of Evidence 702 to testify about the value of Old Globe's "agency force" and that the court should exclude his testimony. Second, defendant contends that the intangible assets that the plaintiff acquired from Old Globe are the actual contracts with the individual agents and managers, not some "nebulous 'relationship,' " and that the "aggregate of those individual contracts with these managers and sales agents *is* the in-place branch office sales force, not some abstract notion of 'agency force.' Plaintiff's failure to value, or even claim deductions for, the in-place branch office sales force is fatal to its claim ...." (emphasis in original). Third, defendant challenges Mr. Miller's valuation of the "agency force" and his determination of the useful life of the "agency force." Fourth, plaintiff argues that the contracts with the individual agents have no useful life and, therefore, are non-depreciable. Finally, defendant asserts that the branch office sales force is a non-depreciable mass asset having no ascertainable useful life.

Based on the discussion which follows, the court finds that the plaintiff has failed to provide a reasonably accurate estimate of the useful life of its "agency force." Because the plaintiff's failure to prove a reasonably accurate estimate of the useful life of its "agency force" precludes recovery, the court need not address whether the "agency force" is a regenerating mass asset or whether the plaintiff has proven the value of the "agency force" over its useful life with reasonable accuracy.[4]

In *Newark Morning Ledger*, the United States Supreme Court stated that, " 'the primary purpose' of an annual depreciation deduction is 'to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes.' " *Id.* at 553, 113 S.Ct. 1670 (quoting *Massey Motors, Inc. v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960)). In this respect, the taxpayer must prove that the asset in question had a "limited useful life, the duration of which could be ascertained with reasonable accuracy." *Id.* at 560, 113 S.Ct. 1670 (discussing *Richard S. Miller & Sons, Inc. v. United States,* 210 Ct.Cl. 431, 537 F.2d 446 (1976)).

The asset in question in the *Newark Morning Ledger* case consisted of 460,000 identified subscribers to eight newspapers the plaintiff had acquired in a merger. *Id.* at 550, 113 S.Ct. 1670. The subscriptions were terminable at will. *Id.* at 550 n. 4, 113 S.Ct. 1670. The plaintiff valued the subscribers at $67,000,000.00, based on the expected future profits to be derived from the subscribers, most of whom were expected to continue to subscribe to the newspapers following the merger. *Id.* at 550, 113 S.Ct. 1670. The plaintiff presented evidence estimating the useful life of the subscribers based on an actuarial analysis, which the government did not contest. *Id.* at 551, 113 S.Ct. 1670. The government argued that the subscribers represented non-depreciable goodwill. *Id.* The majority ruled that because the taxpayer had proven the useful life and ascertainable value of the asset in question, and that the asset was not a regenerating mass asset, the asset qualified for the depreciation allowance under the Tax Code. *Id.* at 570, 113 S.Ct. 1670.

The dissenting opinion in *Newark Morning Ledger*, written by Justice Souter and joined in by three other Justices, however, found it necessary to examine the proof presented by the plaintiff and carefully described the difficulties in estimating the future life of an intangible asset following a merger or acquisition. *Id.* at 571, 113 S.Ct. 1670. Although the majority opinion did not consider it necessary to examine the evidence because of the government's failure to contest that the plaintiff had provided a reasonably accurate assessment of the asset's useful life, the majority acknowledged that "[t]he dissent skillfully demonstrates certain vulnerabilities in petitioner's proof ...." *Id.* at 568 n. 14, 113 S.Ct. 1670.

---

4. The court also notes that because the plaintiff's estimate of the value of Old Globe's "agency force" is based, in part, on its estimate of the useful life of the "agency force," the court's rejection of plaintiff's estimate of useful life leads the court also to reject its valuation of the asset in question.

The dissent in *Newark Morning Ledger* highlighted a crucial assumption of the plaintiff's expert's analysis of the asset following the acquisition of the newspapers, that the level of the paper's subscriptions would remain the same following the acquisition. *Id.* at 579, 113 S.Ct. 1670. The dissent stated:

> The assumption was thus a surrogate for the supposition that the new owners would not rock the boat and would succeed in acting intelligently to keep the paper, if not exactly as it had always been, at least as relatively attractive as it had been in relation to its various competitors on the date of the sale.

*Id.* at 579–80, 113 S.Ct. 1670. The dissent continued its probe into the reliability of the expert's prediction of future events, by pointing out that:

> No matter how much presale satisfaction subscribers have, it seems intuitively obvious that a high enough level of postsale dissatisfaction with a paper would drive subscribers away, as might other postsale events, such as successful competition and demographic changes.

> \*      \*      \*      \*      \*      \*

> Ledger's statistician, in effect, made an assumption regarding Ledger's ability to manage the innumerable factors that keep current customers coming back for more, as well as its ability to attract new customers as the old ones leave. Such discretionary decisions may turn out to be foolish or wise: if foolish, the subscriber base as of the date of sale could be destroyed rapidly; if wise, it would be maintained.

*Id.* at 580 n. 8, 113 S.Ct. 1670.

The views of the dissent in *Newark Morning Ledger* were echoed by the United States Court of Appeals for the Fourth Circuit in *Ithaca Industries, Inc. v. Commissioner,* 17 F.3d 684 (4th Cir.1994), in which the court explained the difficulties in arriving at a reasonably accurate estimate of the useful life of an asset involving characteristics similar to the one currently before the court. The taxpayer in *Ithaca Industries* was a company that manufactured hosiery, undergarments and polo shirts. 17 F.3d at 686. The asset in question in *Ithaca Industries* was an as-

sembled workforce of 5,153 hourly production workers and 212 staff employees. *Id.* The court began with:

> [T]he prosaic observation that every asset declines in some manner, and thus, in theory, every asset could be amortized. This observation is set forth more or less in Section 167(a) of the Internal Revenue Code. At the time of Ithaca's merger, that section stated: "there shall be as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear ... of property used in the trade or business, or ... of property held for the production of income." I.R.C. § 167(a) (1983). Things become a good deal more complicated, however, when we seek in practical terms to quantify "exhaustion" and "wear and tear" for the purposes of assigning depreciation deductions to specific assets.

*Id.* at 687 (footnote omitted).

After determining that the asset in question was not a mass asset because the regeneration of the plaintiff's workforce was accomplished only through Ithaca's "substantial efforts," the court turned to the taxpayer's estimate of the useful life of the asset. *Id.* at 689. While the court stated, "we do not doubt that Ithaca's workforce, as constituted on the day of the merger, began to decline in size and value with the first resignation, termination, or death in that workforce, and that it continued to decline due to these and other factors[,]" the court found that there could be no "defensible estimation of the duration of any one person's employment, nor of the useful life of the workforce of which he or she is a part." *Id.* (footnote omitted).

First, the court in *Ithaca Industries* noted that the task of evaluating the useful life of the workforce asset before it was more difficult than evaluating the subscriptions in *Newark Morning Ledger* because of the different circumstances which impact the consistency of a workforce. *Id.* at 690. The *Ithaca Industries* court stated:

> An employee is not a subscription; indeed, a workforce consisting of human beings perhaps could be no better described than as "composed of constantly fluctuating components." We note in this regard that

the record discloses no predetermined limits of any sort, contractual or otherwise, upon the relationship between Ithaca and its employees. This means that in contrast to a subscription, which is susceptible mainly to the influences affecting one actor, the subscriber, a single employment relationship is susceptible to changing influences affecting two actors, the employer and the employee.

*Id.* at 690. Ithaca's statistical expert attempted to overcome these variables by analyzing the employment history of the acquired company over a four year period and among four job classifications. *Id.* The court conceded that, with a large enough sample size and a test period of sufficient length, actuarial analysis, commonly used in the insurance industry, could control for the numerous variables and could identify a useful life. *Id.* The court found, however, that "we are far from being able to perform such feats reliably with a sample size of roughly 5,000 different people, over only a four-year period, and with only four classifications by job type." *Id.* The court concluded that: "[t]he revenue consequences are simply too serious to tolerate this level of imprecision, and we cannot now envision an approach to a workforce such as Ithaca's that would not suffer from the same shortcomings as Ithaca's statistical method." *Id.*

The plaintiff argues that the circumstances impacting the useful life of the workforce in *Ithaca Industries* are not present in the instant case. First, the plaintiff attempts to contrast an employee workforce with an "agency force." The plaintiff states: "It is more difficult to obtain credible lifing data for an employee workforce than for an agency force. For this reason, Globe has not claimed an amortization deduction for its employee workforce." Regardless of whether the asset in question is an employee workforce or an "agency force," however, the life of the asset is still determined by the duration of an employment relationship and affected by the same variables. In *Ithaca Industries,* the court noted that the estimation of one person's employment, and the useful life of the workforce of which he or she is a part, is determined by the resignation, termination or death of that employee.

*See id.* at 689. Likewise, the plaintiff admits that "in the case of Globe's relationship with an agent, that period [the useful life] begins when the agent becomes authorized to sell Globe's insurance policies, and ends when the authority is terminated, which can occur at the death or disability of the agent or when either Globe or the agent terminates their relationship." Thus, the useful life of the asset in *Ithaca Industries,* the employee workforce, and the asset in the instant case, Old Globe's alleged asset described by plaintiff as the "agency force," are both determined by estimating the average termination of the relationship between the employee and the employer or the agent and the principal. In both cases the workforce suffers from the same variables that impact all human relations. The *Ithaca Industries* court wrote:

A workforce is an unusual asset because it is not only affected by human decisionmaking, but [is] actually *composed* of multiple human actors. As such, [it is] directly affected by the complex interactions of its employees, and by any number of other influences operating upon these actors both in and out of the workplace. This substantial human element injects vagaries into the useful life analysis . . . .

*Id.* at 690 n. 15.

Although neither the dissenting opinion in *Newark Morning Ledger* nor the Fourth Circuit's opinion in *Ithaca Industries* is binding on the case currently before the court, the court believes that the comments on the difficulties of ascertaining the useful life of an intangible asset inextricably tied to human relations due to the high number of variables involved are correct. The evidence in the record establishes that Old Globe's "agency force" was vulnerable to a number of particular variables outside of those that normally would occur in a work force. Moreover, the evidence in the record also establishes that there are particular difficulties in accounting for variables in estimating the useful life of the life insurance company's "agency force."

Charles Hudson, the CEO and Chairman of Torchmark Corporation, the parent corporation of Globe, as well as Old Globe's Chief Actuary, testified that Old Globe was contin-

uously increasing the size of its "agency force." Mr. Hudson also stated, however, that the process of growing its "agency force" was difficult, and the success and duration of certain offices was sporadic: "Every year, we would open new offices. Unfortunately, we would have to close offices almost every year, so it was a continuing process." Moreover, Mr. Hudson stated that it was difficult to determine whether a particular agent would be successful, and, consequently, how long that agent would stay affiliated with the company. In this regard, Mr. Hudson stated:

It's just difficult for an agent to be really successful in the business. It's a difficult business. I can't recall the numbers, but it might be that out of ten people who were recruited, you might get one outstanding agent. Not that many of the others wouldn't survive in the business, but being an outstanding, successful agent was difficult.

James E. Narrel, a Regional Manager with Old Globe for thirty-three and a half years, also testified to Old Globe's constant efforts to recruit and retain agents. In this regard, Mr. Narrel stated that efforts to train agents were directly related to whether an agent would remain affiliated with Old Globe. Mr. Narrel stated:

[I]f you recruited the people and didn't give them good training, then they wouldn't make a living. They wouldn't be able to.

Q. And if the don't make a living?

A. Then they go. They find another job.

In addition, Mr. Narrel stated that it was very difficult to determine whether an agent would be successful, and thus, how long that agent would remain on the job. Finally, Mr. Narrel testified that the attrition rate among agents was very high:

Because the agents would be hired to pay their own expenses and to work on straight commissions. And they couldn't make—since they had no renewals, it was hard for them to make a good living on just commissions. And to stay long enough that the renewals would kick in. Now, the renewals kicked in mostly on the second year. And, if they could last a couple of years, then you had a much lower attrition rate. But the people who failed, most of them failed quickly because they didn't have a lot of money to back them up until they could make enough to get by.

Thus, according to Mr. Narrel, whether an agent would remain with the company depended on the agent's own economic stability.

The testimony of Mr. Hudson and of Mr. Narrel demonstrates that Old Globe's "agency force" was constantly changing due to the company's attempts to grow. In addition, the testimony also demonstrates that the success of an agent, and, thus, the probability that an agent would remain contracted to Old Globe, was directly related to that agent's training, so that Old Globe's recruiting programs must be accounted for when determining the useful life of Old Globe's "agency force."

Nonetheless, the plaintiff argues that Old Globe's relationships with its agents were guaranteed a certain amount of stability because they were "governed by written contracts setting forth in detail the terms of the agency relationships." More specifically, plaintiff argues that the contractual provisions provided that "[a]gents know if they remain with Globe, they will be entitled to renewal commissions, and if they remain long enough, the renewal commissions will 'vest' so that commissions will be paid to the agent after the agent retires." Plaintiff's proffered expert, Mr. Miller, testified that the contractual arrangements respecting renewal premiums was "some glue" that would hold the agent to the company.

The plaintiff's argument assumes that Old Globe's agents would remain with the company long enough for the renewal commissions to vest. In this regard, plaintiff overlooks the evidence its own witnesses proffered regarding the difficulty of hiring and retaining agents. Mr. Hudson testified that it was difficult for an agent to be successful. In addition, Mr. Narrel testified that he had to hire ten agents to keep one. Furthermore, Mr. Narrel testified that the extent to which an agent could remain with Old Globe long enough for his or her renewals to vest was

largely determined by that agent's own financial outlook. Thus, few agents would stay with the company for a significant period of time, making it unlikely that the renewal commissions would vest. To the extent that there was "some glue," that glue apparently did not bind a large number of agents.

Plaintiff attempted to argue that the "skill set" possessed by experienced agents, as compared to the hourly production workers discussed in *Ithaca Industries*, distinguishes its asset from the one discussed in *Ithaca Industries*. Plaintiff states that "an agent who leaves Globe is seldom replaceable," however, plaintiff does not explain how the skill set of its agents insulates them from the fluctuating variables described in *Ithaca Industries*. The plaintiff also fails to consider the analysis in *Ithaca Industries* in which the court concluded that Ithaca's workers were not replaceable without "substantial efforts." *Id.* at 689. Thus, plaintiff's alleged factual distinction is not persuasive.

Evidence in the record also indicates that the variables that concerned the dissenters in *Newark Morning Ledger* and the Fourth Circuit in *Ithaca Industries* are present in the attempt to estimate the useful life of a life insurance company's "agency force." Mr. Miller, plaintiff's expert witness on the life insurance industry and as an actuary, stated that it is very difficult to determine an identifiable time when a life insurance agent's relationship with the company can be said to have terminated. According to Mr. Miller, the easiest circumstance occurs when an agent dies. Mr. Miller testified that in other circumstances, the break is not as clear:

> Most typical is when he [a life insurance agent] quits, which isn't always clear. He may, for all practical purposes, have quit and that shows up as termination of new business. And unfortunately, the dating on the contract termination would not occur until after the agency department had

clearly satisfied itself that the could never recover this item.

In addition, a study produced by the Life Insurance Marketing and Research Association (LIMRA),[5] evaluating the termination rates of agents in 1978, indicated that variation in the performance results of an agent "may be due not only to experience acquired on the job but also to differences present at the time of hiring. For example, agents recruited in one year may have been exposed to a different training program [6] than those recruited in another year." As Mr. Narrel explained, the training and performance of an agent is directly related to that agent's likelihood of survival.

Moreover, an article entitled "The Value of an Agent," published by the Life Insurance Sales Research Bureau and introduced into evidence by the plaintiff, explained that an insurance agent's length of service can vary significantly depending on the quality of the agent. The article separated a selection of agents into three groups according to their ability and tried to calculate the group's survival rates. The study found that the better quality agents were much more likely to have extended service with their parent company. The article noted that "[t]he wide differences in these three survival rates are, as we ourselves can testify, somewhat astonishing—but it should be remembered that they reflect the accumulative effect, over a considerable number of years, of differences in the annual rates of termination." Consequently, the article concluded: "In so far as length of service, taken by itself, is important, [the study's results] throw great emphasis upon the potential betterment which can accrue from improved selection and training, as well as improvement in the other activities which influence turnover."

This court is mindful that even the court in *Ithaca Industries* did not prescribe a per se heightened burden of proof applicable to all assets involving human relations. The standard should remain one of "reasonable accu-

---

5. According to Mr. Miller, LIMRA is the "principal marketing type statistical gathering service associated with the life insurance industry."

6. This factor may have impacted Old Globe even more severely considering that its training was

performed by numerous, individual branch managers rather than a single training program, thus leading to possible discrepancies in training quality.

racy." *See Newark Morning Ledger Co. v. United States*, 507 U.S. at 566, 113 S.Ct. 1670. What the dissent in *Newark Morning Ledger* and the opinion in *Ithaca Industries* state, however, is that the ability of a taxpayer to estimate the useful life of an intangible asset involving human relationships with reasonable accuracy is severely hampered by the variables inherent in the asset itself. In addition, the testimony at trial from Globe's representatives indicated that there are additional variables to take into account which are particular to Old Globe's "agency force," such as the quality of recruiting and training, the quality of the agent and the economic status of the agent.

One key issue is whether the plaintiff's estimate is based on data of sufficient size and reliability to account for the variables which are present. The plaintiff's expert, Richard Miller, is a consulting actuary to the actuarial consulting firm Tillinghast—Towers Perrin, from which he retired in 1995. While the defendant has challenged Mr. Miller as an expert on valuing "agency force," it admits that Mr. Miller is a qualified actuary and an expert in the life insurance industry. Mr. Miller prepared two expert reports for the plaintiff, both of which were entered into evidence. In his first report, Mr. Miller based his estimate of the useful life of the "agency force" on a census of the agents employed at the time the plaintiff acquired Old Globe and decrement assumptions regarding the agent survival rates. The census data described the total number of agents employed by Old Globe at the time of the acquisition and broke down the distribution of those agents into six different experience classes. The decrement assumptions used assumed survival rates to project the numbers of existing agents who would survive into each future calendar year. According to Mr. Miller, "[t]he average number of years of survival of the 'agency force' is an easy calculation after the calculations" of the agent survival rates. Mr. Miller does not describe the steps needed to make this allegedly "easy calculation" in his reports; nor do the work papers, which were provided without explanation and are replete with unexplained abbreviations and acronyms, provide the court with an explanation of this calculation.

Mr. Miller's first report estimated the useful life of the "agency force" acquired in the merger at 8.35 years. After Mr. Miller reviewed the report of the defendant's expert, Robert F. Reilly, who was qualified at the trial as an expert in valuing intangible assets and "agency force," the transcript of the deposition of Mr. Reilly, and the transcript of his own deposition, Mr. Miller drafted a supplement to his first report. According to Mr. Miller's second report, the useful life estimate of 8.35 years in the first report was incorrect. The 8.35 estimate represented the average life of the most experienced group of agents at Old Globe, not the average useful life of the complete "agency force." According to the second report, the correct useful life, using the data relied upon in the first report, should be 6.34 years. Mr. Miller's supplemental report, however, also responded to criticism from Mr. Reilly by using a different set of termination rates. Using the second set of termination rates, Mr. Miller arrived at a useful life of 6.1 years.

The termination rates used by Mr. Miller in both his first report and in his supplemental report, however, were problematic. The origin of Mr. Miller's analytical problems was the data provided to him. According to Mr. Miller's first report, while the annual statements provided by Globe were reliable, "in the course of the assignment questions arose concerning the validity of some other underlying data. This is particularly the case with the agent production profile and agent termination dates." Mr. Miller testified that, although he would have preferred to use actual termination rates, the data possessed by Globe was unreliable. Mr. Miller stated:

> The data that entered into the computer listing was not useful for termination determination. The termination dates listed clearly they were—they were—agents were not terminated until all commissions payable under the agency contract were paid, which means that they were making payments to people characterized as "estate of" or "administrator for." These were clearly terminated agents as far as I'm concerned.

Thus, initially, Mr. Miller turned to a report prepared by Paul Campbell, the chief actuary of LIMRA. The Campbell report estimated the value of the Old Globe "agency force" as of December 31, 1980 at $25,200,000.00. While the Campbell report did include a set of termination rates for Old Globe agents, those rates were based on a single year of data, 1980. In addition, Mr. Miller could not verify Mr. Campbell's results because he did not have Mr. Campbell's work papers or data. Therefore, Mr. Miller had chosen not to rely on the Campbell data in his first report.

Instead, Mr. Miller relied on industry-wide termination data collected by LIMRA in separate reports for the years 1978, 1979 and 1980. Although life insurance companies of varying sizes contributed to the report, Old Globe did not contribute to the data. Mr. Miller testified that it was "highly probable that there were very few companies that contributed who were as small as [Old] Globe." Mr. Miller's report indicates that he was comfortable using the LIMRA data because the survival and production profiles used by Mr. Campbell were similar to the LIMRA values. Mr. Miller qualified this statement at the trial, noting that he believed that the LIMRA retention rate data was similar to the Campbell data for years two through six plus. Mr. Miller did not testify, however, that he believed the first year data to be similar. Indeed, the Campbell data is significantly different from the LIMRA data for year one. Mr. Campbell estimated the first year survival rate of Old Globe agents in 1980 at thirty percent, while the LIMRA data estimated that, industry-wide, the survival rate of agents from 1978 through 1980 was seventy percent. Using the LIMRA data described above, together with an acknowledged mathematical error injected by Mr. Miller, Mr. Miller's first report estimated the useful life of the "agency force" at 8.35 years. In the second report, Mr. Miller corrected for the mathematical error and estimated that the useful life using the LIMRA data would be 6.34 years.

In addition to correcting the useful life calculation as noted in the first report, the second report also addressed a criticism of the first report made by Mr. Reilly concerning the use of LIMRA termination rates. In Mr. Reilly's deposition, he was questioned why Mr. Miller used the LIMRA data. Mr. Reilly suggested that "if Mr. Campbell had access to actual contemporaneous data and he performed what appears to be a competent lifing analysis I don't know why, I guess I simply would try to reconstruct data that can only be inaccurate when, in fact, we have accurate data from a contemporaneous period of time, frankly." In response, Mr. Miller's second report stated:

> LIMRA data was used because [Old] Globe's actual data, that would have been available in 1980, no longer exists. LIMRA data is the natural choice when company specific data is unavailable, when LIMRA data enjoys considerable credibility within the insurance industry and Mr. Campbell stated that the expected rates of [Old] Globe agent survival were consistent with LIMRA average survival rates for the life insurance industry. Mr. Campbell's report was based on actual [Old] Globe experience. Based on my personal knowledge of Mr. Campbell's work, I have a high degree of confidence in Mr. Campbell's statements. I agree with Mr. Reilly that it is also reasonable under the circumstances to rely on the rates determined by Mr. Campbell.

Thus, using the termination rates in Mr. Campbell's report, in his second report, Mr. Miller arrived at a useful life of 6.1 years.

Neither the LIMRA termination rates nor the Campbell rates, however, are of sufficient breadth to account for the numerous variables to be considered. First, the Campbell data was not compiled over a long enough period of time for it to be reliable. Mr. Miller testified that he would need five years of data on agent terminations to produce an accurate termination rate to ensure that no one year was an aberration. The Campbell termination rates were calculated, however, over a single year period, 1980, which led Mr. Miller to reject the Campbell data in the first place. Moreover, the LIMRA report which Mr. Miller eventually relied upon indicates the dangers in relying on a single year of data. The reports included a projected four-

year retention rate based on the survival rates of four groups of agents for a single survey year. The report warned:

> [S]ince [the four-year retention rate] is based on a single year's observation, it may be influenced by events that occur only in that year if they affect all agents equally. The reader is cautioned that for an individual company, one or more of the four survival rates in the projection could be quite unstable because of the number of cases on which it is based.... Obviously, wide year-to-year variation in the rates will affect the projections.

In addition, the court notes that in *Ithaca Industries,* the Fourth Circuit rejected a sampling taken over four years. *Ithaca Indus., Inc. v. Commissioner,* 17 F.3d at 690. Finally, Mr. Miller, described the Campbell termination data for the first two class years as "completely unreliable." Therefore, pursuant to Mr. Miller's own expressly described standards, the one year of Campbell data cannot provide a reliable sample.

Having rejected the Campbell termination rates, the court turns to Mr. Miller's reliance on the data supplied in the LIMRA reports. The plaintiff argues that it is entitled to rely on the LIMRA data pursuant to Treasury Regulation § 1.167(a)–1(b), which states: "If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination." Plaintiff's reliance on Treasury Regulation § 1.167(a)–1(b) is misplaced. The regulation applies when a company has not had sufficient time in which to acquire the data necessary to perform a useful life analysis, not when the company simply loses data or has unreliable data. Treasury Regulation § 1.167(a)–1(b) may only be invoked until such time as the taxpayer has sufficient experience, which is indicative of the fact that the regulation applies to inexperienced companies. Moreover, expanding the regulation to allow a taxpayer to rely on industry information whenever it does not have sufficient data would be to expand the regulation to an infinite and illogical degree; for example, a taxpayer would be allowed to rely on industry data simply because it had not bothered to keep adequate records. In the instant case, Old Globe had over thirty years of data on which it could have relied. The data that Old Globe collected, however, was either corrupted or lost.

Moreover, if Treasury Regulation § 1.167(a)–1(b) does apply, it merely opens the door to the use of industry data, it does not speak to the reliability of that industry data. The LIMRA termination data was collected over a three year period. Therefore, according to Mr. Miller's own standards, neither the Campbell data (collected over one year), nor the LIMRA data were collected over a sufficient period of time to account for variances in any single year. Similarly, as noted above, the LIMRA report itself warns of relying on limited samples due to "wide year-to-year" variation in the rates at issue. Plaintiff has not demonstrated that the three year sample size of LIMRA data can account for the numerous variables involved in the calculation of termination rates.

Further, the LIMRA data Mr. Miller used is not a reliable substitute for Old Globe's actual termination rates. The importance of company specific data was discussed in the LIMRA report. The report warned the reader to be careful when comparing company specific data to the rates provided in the report because "specific company situations may affect the results." The LIMRA termination rates were derived from data compiled from surveys submitted by multiple life insurance companies of different sizes. These companies were divided into three categories: Size A companies with ten billion dollars or more ordinary life insurance-in-force at the beginning of the reporting year; Size B companies with two to ten billion dollars ordinary life insurance-in-force at the beginning of the reporting year; and Size C companies with less than two billion dollars ordinary life insurance-in-force at the beginning of the reporting year. As noted above, Old Globe did not contribute to the LIMRA study. In addition, Mr. Miller testified that it was "highly probable that there were very few companies that contributed who were as small as [Old] Globe." There also is nothing in the record to indicate that the quality of the recruiting and training programs used

by the companies that contributed to the LIMRA data were similar to the training employed by Old Globe, two variables particularly important in calculating an agent's survival rate. Therefore, there is little indication, aside from Mr. Miller's unsubstantiated assumption, that the LIMRA data was representative of Old Globe's actual termination rate.

Based on the above discussion, the court finds that plaintiff cannot rely on the LIMRA termination reports in estimating the useful life of Old Globe's "agency force." First, the LIMRA data was based on only three years of data, smaller than the five year standard set by Mr. Miller and the four year projection rejected by the Fourth Circuit in *Ithaca Industries*. In addition, the industry wide data does not account for particular variances between individual companies. Therefore, the court concludes that the LIMRA termination rates cannot account for the vast number of elements which affect human relationships, or the particular variables involved in predicting the useful life of Old Globe's "agency force."

Finally, the court notes that Mr. Miller's reversal regarding which data to rely on also is indicative of the unreliable nature of the Campbell and LIMRA termination rates.

Mr. Miller testified that he initially decided not to rely on the Campbell termination rates. Therefore, Mr. Miller chose to rely on the LIMRA data. In his supplemental report, however, despite the fact that he acknowledged that the first two years of the Campbell termination rates were completely unreliable, Mr. Miller decided "that it is also reasonable" to use the Campbell data. Thus, while Mr. Miller chose to perform his valuation in the second report using the Campbell data, he did not reject the LIMRA termination rates.

Mr. Miller's supplemental report attempted to reconcile his initial rejection of the Campbell rates and his decision to use the LIMRA rates in his first report with his revised opinion in his supplemental report that the Campbell rates were also reasonable by arguing that the LIMRA rates are similar to the Campbell rates. At trial, however, Mr. Miller qualified his opinion by stating that the LIMRA rates are similar to the Campbell rates only for years two through six. Mr. Miller's testimony was more accurate than his supplemental report. A comparison of the Campbell rates to the LIMRA dates shows significant inconsistency in the first year data:

| Calendar Year of Service | LIMRA Rate of Survival (1978) | LIMRA Rate of Survival (1979) | LIMRA Rate of Survival (1980) | Campbell Rate of Survival (1980) |
|---|---|---|---|---|
| 1 | 70 | 69 | 71 | 30 |
| 2 | 46 | 47 | 47 | 45 |
| 3 | 63 | 62 | 61 | 65 |
| 4 | 73 | 73 | 73 | 75 |
| 5 – 9 | 84 | 83 | 81 | 5 only – 80 |
| 6 + | | | | 90 |

It is unclear how Mr. Miller can find that both the LIMRA data and the Campbell data are reasonable when the two sets of termination rates are different and result in inconsistent estimates of the useful life of Old Globe's "agency force." The court hopes that Mr. Miller's sudden acceptance of the Campbell termination rates was not prompted by litigation strategy on his part. In response to criticism by the defendant's expert [7] suggesting that his reliance on the

7. Plaintiff attempts to use Mr. Reilly's criticism of the LIMRA data to show that Mr. Reilly accepted the Campbell termination rates as reasonable. The plaintiff first cites to Mr. Reilly's deposition testimony, which was read into the record, in which Mr. Reilly stated:

If Mr. Campbell has contemporaneous company-specific lifing data and he reaches a lifing

LIMRA data was incorrect, Mr. Miller chose to present two estimates of useful life to the court, each based on different termination rates, apparently in the hope that the court would choose at least one.

In its complaint, the plaintiff also asserts an alternative claim for deduction under I.R.C. § 165 for losses sustained in the years 1981 through 1986 with respect to contractual relationships with agents that were lost. In its Memorandum of Contentions of Fact and Law submitted to the court prior to the pretrial conference, it appears that the plaintiff has narrowed the scope of its alternative claim to losses arising out of the bankruptcy of the Employee Benefits partnership, which occurred during the performance period of Old Globe's contract with Employee Benefits. According to the Memorandum of Contentions of Fact and Law, plaintiff's alternative argument was presented in the event that "defendant prevails in its argument that the intangible asset owned by [Old] Globe was its contract with the Employee Benefits partnership . . . ." In its post-trial brief, the plaintiff did not include its alternative claim in its list of the questions presented at trial. The defendant, in its post-trial brief, noted the plaintiff's failure to present an argument on its alternative claim following the trial. Moreover, the defendant argued that Mr. Miller assigned no value to the contract between Employee Benefits and Old Globe. The plaintiff, again, failed to address the alternative claim in its reply to defendant's response.

Although the plaintiff has failed to present post-trial argument on its alternative I.R.C. § 165 loss claim, because the claim is present in the complaint and plaintiff has not expressly dropped the claim, the court will address it. Section 165 of the I.R.C. states: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated by insurance or otherwise." Treasury Regulation § 1.165–1(d)(1) provides:

A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.

Treasury Regulation § 1.165–2(a) further provides:

A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discounted or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.

The plaintiff claims that value of the Employee Benefits contracts, and, thus, the amount

conclusion I think that's reasonable because he has contemporaneous good data. I would be inclined to use Mr. Campbell's results. Why would I ever then go and use industry data if I had reason to believe Mr. Campbell did it right? I mean it just honestly it doesn't make any sense too me to say, "Well, I have reason to believe the other guy did it right and his conclusion was right. Therefore, I am going to ignore what he did in his conclusion and use industry data because it kind of is like industry data."

\* \* \* \* \* \*

Why would you ever take that last step? Why would you just say, "I can see what Campbell did, I can see his data sources?"

Mr. Reilly's deposition is prefaced by two important assumptions. The first assumption was that Mr. Campbell had contemporaneous data and the second assumption was that Mr. Campbell's

data was available for review. Neither of these assumptions is correct. The plaintiff also cites to a portion of Mr. Reilly's trial testimony to argue that Mr. Reilly "does not dispute that fact that the average remaining useful life of the agency force is six years." Mr. Reilly's testimony was in response to a rather vague question from plaintiff's counsel as to what the six years mentioned in Mr. Miller's report related to:

I can understand that because if six years is the correct life, then the amortization period would be six years, and the tax yield would be calculated based on six years.

Q. So you've got no problem with that?

A. Well, assuming six years is the correct life.

Mr. Reilly assumed that six years was the correct life for the purpose of the question, his testimony did not accept six years as the useful life of Old Globe's "agency force."

of the loss it is entitled to, is equal to the value of the agents who worked under the supervision of the partnership. Plaintiff points to a table in Mr. Miller's supplemental report which states that, of the $29,203,000.00 Mr. Miller estimated as the value of Old Globe's "agency force," $6,284,000.00 is allocable to the value of the agents in the Employee Benefits Operation. At trial, however, Mr. Miller expressly denied having valued the general agency contract with Employee Benefits. Moreover, the valuation of the Employee Benefits agents is based upon a period of useful life derived from the same, defective data used by Mr. Miller in an attempt to ascertain the useful life of Old Globe's "agency force." Therefore, the court finds that plaintiff has failed to provide sufficient evidence to support its claim for loss deductions under I.R.C. § 165.

## CONCLUSION

Plaintiff has failed to provide the court with a reasonably accurate estimate of the useful life of the asset in question. Therefore, plaintiff's claim must fail. Plaintiff's claim under I.R.C. § 165 also is denied. The Clerk's Office shall enter JUDGMENT for the defendant.

**IT IS SO ORDERED.**