122 T.C. No. 11


UNITED STATES TAX COURT


CAPITAL BLUE CROSS AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13322-01.              Filed March 12, 2004.


        As part of its statutory conversion under sec.
1012(a) and (b) of the Tax Reform Act of 1986, Pub. L.
99-514, 100 Stat. 2390, from a tax-exempt to a taxable
entity, petitioner generally was entitled to step up
its tax basis in its assets to their Jan. 1, 1987, fair
market value.

        Held, among other things, for 1994:  (1) The basis
step-up provision of sec. 1012(c)(3)(A)(ii) of the Tax
Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2394, is
not limited to "sale or exchange" transactions; and (2)
because petitioner's valuation of its health insurance
group contracts did not constitute a contract-by-
contract valuation, did not establish a credible
discrete value for each contract, and is otherwise
deficient, claimed loss deductions under sec. 165,
I.R.C., in the cumulative total amount of $3,973,023
relating to petitioner's 376 health insurance group
contracts that were terminated in 1994 are not
allowable.

Peter H. Winslow and Samuel A. Mitchell, for petitioner.

Ruth M. Spadaro, James D. Hill, Robin L. Herrell, and Adam Trevor Ackerman, for respondent.

OPINION

SWIFT, Judge:  For 1994, respondent determined a deficiency of $532,192 in petitioner's Federal income tax.

The issue for decision involves the allowability of $3,973,023 (hereinafter rounded to $4 million) in cumulative total loss deductions claimed under section 165 relating to petitioner's health insurance group contracts (group contracts).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1994, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner, Capital Blue Cross, is the common parent of an affiliated group of corporations that filed consolidated corporate Federal income tax returns.  The loss deductions at issue relate to the business activity of Capital Blue Cross, and references to "petitioner" in the singular refer only to Capital Blue Cross.

## Background

Some of the facts have been stipulated and are so found.

In 1938, petitioner was organized under the laws of Pennsylvania as a "hospital plan corporation" to provide health insurance to individuals and to sponsoring groups (e.g., employers). Petitioner maintains its corporate office in Harrisburg, Pennsylvania.

In 1972, petitioner became licensed as an independent Blue Cross Association under which license petitioner was authorized to sell health insurance to individuals and to sponsoring groups located within a 19-county area of south-central Pennsylvania under the registered trade name and service mark of the Blue Cross Association.

In 1982, the Blue Cross Association merged with the National Association of Blue Shield Plans to form the Blue Cross Blue Shield Association (BCBS). After BCBS was formed in 1982, petitioner operated as an independent licensee of BCBS and continued to sell health insurance to individuals and to groups in south-central Pennsylvania.

On November 1, 1985, by merger with Blue Cross of Lehigh Valley, petitioner also acquired the right to sell health insurance in the two counties located in Lehigh Valley, Pennsylvania. Thereafter, under the registered trade name and service mark of BCBS, petitioner sold health insurance to individuals and to groups located within a 21-county area in south-central and in Lehigh Valley, Pennsylvania.

In its service area, petitioner provided (and continues to provide) health insurance to individuals and to groups who entered into contracts with petitioner for health insurance coverage and who paid premiums for the coverage. Consistent with its social mission, generally the physical condition of individuals and of the individual members of the groups applying for health insurance was not a basis for petitioner to decline to provide health insurance coverage.

As of January 1, 1987, not including health insurance contracts that petitioner had entered into directly with individuals, petitioner had outstanding 23,526 health insurance group contracts.[1]

Generally, sponsoring organizations for each group contract, such as employers, as well as the individual members of each group were to pay premiums to petitioner, and petitioner was to provide health insurance coverage to the individual members of each group and, where applicable, to the spouse and to the dependents of each member.[2]

---

[1] Because a number of groups had entered into more than one contract with petitioner, the 23,526 group contracts in effect on Jan. 1, 1987, represented 12,579 separate groups.

[2] The manner by which the payment of premiums to petitioner with regard to each group contract was divided between the group sponsor and its individual members was decided by each group, and petitioner had no say in that matter. References herein to "premiums" do not distinguish between the portion thereof to be paid by a sponsoring group and the portion thereof to be paid by

(continued...)

Generally, each individual member of a group who purchased insurance from petitioner could elect the type of insurance benefit and the type of insurance coverage that would be applicable.

We use the word "benefit" herein to distinguish between insurance that was applicable to an individual only, to an individual as a parent with one or more dependents, or to an individual as a parent with a spouse and children (family).

We use the word "coverage" herein to distinguish between the different types of medical costs that, as of January 1, 1987, were reimbursable by petitioner under the various group contracts as follows.

Under basic medical, the costs of basic medical services performed by "professional providers" (e.g., doctors, dentists, optometrists, and physical therapists) were covered.

Under basic hospital, the costs of basic hospital services such as inpatient and outpatient services obtained in hospitals or in surgical centers were covered.

Under major medical, major medical services not covered under basic medical and basic hospital were covered.  Major medical also covered a portion of the costs of prescription drugs.

---

[2](...continued)
individual members of each group.

Under comprehensive, the costs of basic medical services, basic hospital services, and major medical services were all covered.

As a hospital plan corporation, the health insurance premiums charged by petitioner were regulated by the Pennsylvania Insurance Department (PID). Petitioner was required annually to submit for approval to the PID its proposed health insurance premium rates.

As of January 1, 1987, total annual premiums charged by petitioner with respect to each group contract were based on one of three premium rating methods.

Community-Rated Group Contracts

Premiums relating to groups consisting of fewer than 100 individual members (representing approximately 90 percent of all of petitioner's group contracts) were "community-rated", meaning that annual premiums for each community-rated group were based on the cumulative claims history or claims experience of all of petitioner's community-rated group contracts with the same benefit type (i.e., individual, single parent with dependents, or family) and with the same coverage type (i.e., basic medical, basic hospital, major medical, or comprehensive). Claims experience (or claims submitted to petitioner) for the current year relating to all community-rated group contracts with the same benefit and coverage type would be reviewed by petitioner

and would serve as the basis for the premiums to be charged in the following year for group contracts with the same benefit and the same coverage type.

As indicated, the distinguishing feature of community-rated group contracts was that the annual premiums and the annual increase or decrease, if any, in premium rates relating to community-rated group contracts would be the same for all community-rated group contracts with the same benefit and the same coverage type.

Experience- and Cost-Plus-Rated Group Contracts

Premiums petitioner charged relating to groups with 100 or more individual members (representing more than half of the total premiums petitioner received) were either "experience" or "cost-plus" rated.

With regard to experience-rated group contracts, total claims received by petitioner from members of each experience-rated group would be reviewed and would constitute the basis for the premiums to be charged to the group in the following year. Obviously, under this method, premium rate increases or decreases relating to each experience-rated group contract would be unique.

Experience-rated group contracts offered by petitioner had either a "retrospective refund" or a "retrospective credit" feature (the first providing a cash refund, the second providing a credit) relating to situations where total premiums received by

petitioner in a year from a group were considered excessive in light of the total medical claims paid by petitioner during the year on behalf of the group and its members.

Cost-plus group contracts simply represented a variation of experience-rated group contracts. Premiums on cost-plus group contracts would be calculated for the following year based upon claims submitted to petitioner and petitioner's administrative costs relating to each group for a year.

Cost-plus group contracts offered by petitioner had a retrospective adjustment feature that, where applicable, adjusted the total premiums received by petitioner for a year to reflect the group's actual claims and petitioner's administrative costs for the year relating to the group.

Other Matter

As indicated, the rating formulas used by petitioner to determine the premium rates for its group contracts were subject to annual approval by the PID.

Unless terminated, community-rated group contracts were automatically renewed with petitioner on a month-to-month basis, and experience-rated and cost-plus group contracts were automatically renewed with petitioner on an annual basis.

Regardless, however, of the nominal renewal terms associated with petitioner's group contracts, as a practical matter, all of petitioner's group contracts were effectively terminable at will

by each group because at any time a group could stop paying the premiums owed to petitioner which would result in the cancellation by petitioner of the contract.

Groups whose health insurance group contracts with petitioner were terminated were placed by petitioner on a prospective customer list that was used by petitioner in subsequent years to contact the groups and, where appropriate, to seek renewal of the contracts.

As of January 1, 1987, in petitioner's 21-county service area no other health insurance company maintained a better provider network (consisting of hospitals, doctors, and other providers of health care) or offered better health care benefits at premium rates comparable to those of petitioner, and in its service area petitioner maintained a dominant share of the medical health insurance market.

By 1987, however, the national health insurance marketplace was experiencing rising health care costs, the emergence of new health care products, and the continued growth of alternative health care product delivery services such as Health Maintenance Organizations (HMOs), Preferred Provider Organizations (PPOs), and health insurance plans administered by third party administrators.

As a result, by 1987, petitioner faced increased competition from HMOs and from PPOs.

From its organization in 1938 through the time of trial in March and April of 2003, petitioner has been exempt from Pennsylvania premium and Pennsylvania income taxes. See 40 Pa. Cons. Stat. Ann. sec. 6103(b) (West 1999).

From its organization in 1938 through December 31, 1986, for Federal income tax purposes, petitioner operated as a tax-exempt organization under section 501(c)(4) and its predecessor statutes.

Effective January 1, 1987, as a result of enactment of sections 501(m) and 833 and because petitioner constituted an existing Blue Cross Blue Shield organization, petitioner became subject to Federal income tax. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1012(a) and (b), 100 Stat. 2085, 2390-2394 (TRA 1986). The basis step-up provision of section 1012(c)(3)(A)(ii) of TRA 1986 (hereinafter generally cited simply as TRA 1986 section 1012(c)(3)(A)(ii)) was applicable specifically to petitioner and to other Blue Cross Blue Shield organizations. This basis step-up provision, in situations about which the parties dispute, provided generally that Blue Cross Blue Shield organizations such as petitioner were entitled, for purposes of determining gain or loss for Federal income tax purposes, to step up their tax basis in assets owned on January 1, 1987, to the assets' January 1, 1987, fair market value.

The conversion of Blue Cross Blue Shield organizations to taxable status was enacted because Congress believed that the prior tax-exempt status of these organizations provided the organizations unfair competitive advantages over taxable commercial health insurance companies. H. Rept. 99-426, at 664 (1985), 1986-3 C.B. (Vol. 2) 1, 664.

Petitioner's 376 health insurance group contracts in issue herein for 1994 constituted for petitioner self-created assets.[3]

Understandably, because it was exempt from Federal income tax, from its organization in 1938 through 1986 petitioner did not reflect in its tax books and records any cost basis relating to its self-created health insurance group contracts.[4] Accordingly, the basis step-up provision of TRA 1986 provides petitioner with the only ground for establishing a tax basis in the 376 group contracts.

Because of petitioner's new taxable status and under petitioner's interpretation herein of the basis step-up provision of TRA 1986, beginning January 1, 1987, petitioner would have

---

[3] Apparently, petitioner's 376 group contracts (which were terminated in 1994 and to which the loss deductions in dispute herein relate) do not include any of the Lehigh Valley group contracts that arguably were "purchased" by petitioner in 1985 when petitioner merged with Blue Cross of Lehigh Valley.

[4] Also, for the indicated pre-1987 years the evidence does not indicate that petitioner's financial books and records reflected any cost basis in its self-created health insurance group contracts.

been entitled to make adjustments in its tax books and records to reflect a step up in its tax basis, for purposes of determining gain or loss, relating to each of its 23,526 group contracts that were in effect on January 1, 1987 (including the 376 group contracts at issue herein), from zero to an amount equal to each contract's January 1, 1987, fair market value. During 1987 through 1994, however, in petitioner's tax books and records no such tax basis adjustments were made.

Accordingly, on its originally filed corporate Federal income tax returns for 1987, 1988, 1989, 1990, 1991, 1992, and 1993, petitioner claimed no loss deductions under section 165 relating to its health insurance group contracts that were outstanding on January 1, 1987, and that were terminated during each respective year.

On its 1994 corporate Federal income tax return, petitioner first claimed loss deductions under section 165 relating to terminated health insurance group contracts.

As filed on approximately September 15, 1995, there was reflected on petitioner's 1994 corporate Federal income tax return loss deductions under section 165 in the cumulative total amount of $2,648,249 relating to the claimed fair market value of the 376 group contracts (that were among petitioner's 23,526

group contracts in effect on January 1, 1987, and that were terminated in 1994).[5]

The total $2,648,249 in loss deductions claimed on petitioner's 1994 corporate Federal income tax return was based on a September 10, 1995, valuation report (initial valuation report) prepared for petitioner by a major accounting firm. The initial valuation report calculated a value for all of petitioner's 23,526 group contracts that were in effect on January 1, 1987, by separating the contracts into two blocks -- small groups (with less than 100 individual members) and large groups (with 100 or more individual members). The initial valuation report set forth, as of January 1, 1987, a cumulative total value for all of petitioner's small group contracts of $57.8 million, and a cumulative total value for all of petitioner's large group contracts of $105.7 million, for a combined cumulative total value for both blocks (representing all 23,526 of petitioner's group contracts in effect on January 1, 1987) of $163.5 million.

_____

[5] Petitioner has not claimed loss deductions relating to the termination of any health insurance contracts that it entered into directly with individuals. Also, where a group entered into more than one contract with petitioner, petitioner claimed a loss deduction with regard to its multiple contracts with that group only in the year in which the group's last contract with petitioner was terminated. Because of this last point, the 376 group contracts for which petitioner now claims loss deductions for 1994 actually represent 698 insurance contracts relating to 376 groups.

The total $2,648,249 in loss deductions claimed on petitioner's 1994 corporate Federal income tax return apparently constituted simply a pro rata share of the valuation reflected in the initial valuation report of petitioner's small group contracts and a pro rata share of petitioner's large group contracts.[6]

Also, in the fall of 1995, at approximately the same time that petitioner filed its 1994 corporate Federal income tax return, petitioner filed amended corporate Federal income tax returns for 1991, 1992, and 1993 (the years then open under the applicable refund periods of limitation) in which petitioner claimed loss deductions under section 165 and tax refunds relating to the claimed cumulative total fair market value (as calculated in the initial valuation report) of petitioner's health insurance group contracts that were in effect on January 1, 1987, and that were terminated during each respective year.

On audit, in a notice of deficiency dated August 16, 2001, respondent disallowed completely the $2,648,249 in total cumulative loss deductions for 1994 relating to the 376 group contracts terminated in 1994. Also, petitioner's claimed refunds

---

[6] Because petitioner did not introduce into evidence herein the initial valuation report, the particular math associated with the $2,648,249 total valuation reflected therein is not in evidence.

for 1991, 1992, and 1993, relating to group contracts terminated in those years, were not allowed by respondent.

In its petition filed herein on November 13, 2001, petitioner claimed loss deductions under section 165 in the total amount of $3,342,944 relating to the claimed cumulative total value of the 376 group contracts terminated in 1994. No explanation is provided as to the increase in this amount from the $2,648,249 in total loss deductions claimed on petitioner's 1994 corporate Federal income tax return relating to the 376 group contracts.

Subsequently, and in preparation for trial which was held in March and April of 2003, petitioner's trial expert witness prepared a valuation report dated January 30, 2003, in which he calculated, as of January 1, 1987, a cumulative total fair market value of $4 million for the 376 group contracts that were terminated in 1994 (based on a cumulative total fair market value of $131,697,202 for all 23,526 of petitioner's group contracts in effect on January 1, 1987).[7]

---

[7] The record is unclear as to how, for the 376 group contracts terminated in 1994, petitioner's trial expert calculated a higher cumulative total value ($4 million) than was calculated in petitioner's initial valuation report ($2.6 million), even though for all 23,526 of petitioner's group contracts in effect on Jan. 1, 1987, petitioner's trial expert calculated a lower cumulative total value ($132 million) than the initial valuation report ($163.5 million).

Accordingly, based on its trial expert's valuation of the 376 group contracts, petitioner now claims total loss deductions for 1994 under section 165 in the amount of $3,973,023 (an increase of $1,324,774 over the $2,648,249 in total loss deductions claimed therefor on petitioner's 1994 corporate Federal income tax return).

Further, on March 31, 2002, petitioner filed second amended corporate Federal income tax returns for 1992 and 1993, increasing for those years the total loss deductions claimed under section 165 relating to terminated group contracts for those years.

For years after 1994, petitioner continued to claim loss deductions under section 165 relating to the value of petitioner's group contracts in effect on January 1, 1987, that were terminated in each respective year.

For 1991 through 2000, the loss deductions claimed by petitioner under section 165 relating to petitioner's valuation of group contracts terminated in each year (that were in effect on January 1, 1987) total approximately $37 million as set forth below:

|       | Amount of               |
| Year  | Claimed Loss Deductions |
| ----- | ----------------------- |
| 1991  | $ 7,998,612             |
| 1992  | 7,234,627               |
| 1993  | 4,719,542               |
| 1994  | 3,973,023               |
| 1995  | 2,816,165               |
| 1996  | 3,120,934               |
| 1997  | 1,444,088               |
| 1998  | 1,750,240               |
| 1999  | 2,190,111               |
| 2000  | 1,861,149               |
|       | $37,108,491             |

## Discussion

The primary issues for decision involve a legal issue and a factual issue, as follows:  (1) Whether the basis step-up provision of TRA 1986 is applicable to calculations of gain or loss relating only to "sale or exchange" transactions and not to calculations of loss relating to the "termination" of assets; and (2) whether the specific and discrete fair market value, as of January 1, 1987, of the 376 group contracts terminated in 1994 has been adequately established by petitioner for purposes of the claimed loss deductions under section 165.

## Construction of TRA 1986

As explained, supra, in conjunction with their conversion from nontaxable to taxable status, Congress provided for Blue Cross Blue Shield organizations a fair market value basis step-up provision.  The purpose of the basis step-up provision was to prevent Blue Cross Blue Shield organizations from being taxed on

appreciation in the value of assets that had occurred in pre-1987 years when the organizations had not been subject to Federal income tax. H. Conf. Rept. 99-841 (Vol. II), at II-350 (1986), 1986-3 C.B. (Vol. 4) 1, 350. The relevant statutory language of the basis step-up provision as set forth in TRA 1986 section 1012(c)(3)(A)(ii), 100 Stat. 2394, provides as follows:

> for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of * * * [the 1st taxable year beginning after Dec. 31, 1986], shall be treated as equal to its fair market value as of such day.

Respondent argues that because the above statutory language fails to state expressly the kinds of losses to which the basis step-up provision is intended to apply, the statutory language should be regarded as ambiguous and the legislative history of TRA 1986 section 1012(c)(3)(A)(ii) should be controlling. In the legislative history, it is stated that the basis step-up provision is limited to "sale or exchange" transactions. The relevant language from the conference report is underscored below:

> the basis of assets of * * * [BCBS] organizations is equal, for purposes of determining gain or loss, to the amount of the assets' fair market value on the first day of the organization's taxable year beginning after December 31, 1986. Thus, for formerly tax-exempt organizations utilizing a calendar period of accounting and whose first taxable year commences January 1, 1987, the basis of each asset of such organization is equal to the amount of its fair market value on January 1,

1987.  The basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes.  The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.  [H. Conf. Rept. 99-841 (Vol. II), at II-349-II-350, 1986-3 C.B. (Vol. 4) 1, 349-350; emphasis added.]

Petitioner argues that the statutory language is not ambiguous and provides no limitation on the types of transactions to which the basis step-up provision applies and therefore that the limiting language in the legislative history is irrelevant.

In interpreting a statute, we look first to the language of the statute, and we look only to legislative history to learn the purpose of the statutory language or to resolve ambiguities in the statutory language.  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980); Valansi v. Ashcroft, 278 F.3d 203, 209 (3d Cir. 2002); Fed. Home Loan Mortgage Corp. v. Commissioner, 121 T.C. 129, 134 (2003); Wells Fargo & Co. v. Commissioner, 120 T.C. 69, 89 (2003); Allen v. Commissioner, 118 T.C. 1, 7 (2002).

If the language of a statute is plain, clear, and unambiguous, the statutory language is to be applied according to its terms, United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Burke v. Commissioner, 105 T.C. 41, 59 (1995), unless a literal interpretation of the statutory language would lead to

absurd results.  Green v. Bock Laundry Mach. Co., 490 U.S. 504, 509 (1989); Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998); Gen. Dynamics Corp. v. Commissioner, 108 T.C. 107, 121 (1997).  As the Court of Appeals for the Third Circuit has explained:

> Where the statutory language is plain and unambiguous, further inquiry is not required, except in the extraordinary case where a literal reading of the language produces an absurd result.  * * *  [Idahoan Fresh v. Advantage Produce, Inc., supra at 202.]

Recently, in Trigon Ins. Co. v. United States, 215 F. Supp. 2d 687 (E.D. Va. 2002), supplemented at 234 F. Supp. 2d 581 (E.D. Va. 2002), the precise legal question before us as to the interpretation of TRA 1986 section 1012(c)(3)(A)(ii) and its application to Blue Cross Blue Shield organizations was addressed.  Trigon Ins. Co. also involved claimed loss deductions under section 165 relating to the termination of health insurance group contracts that were in effect on January 1, 1987.  The District Court agreed with the taxpayer (and with petitioner's legal position herein) that the language of TRA 1986 section 1012(c)(3)(A)(ii) was clear and unambiguous and therefore that, in spite of the limiting language in the legislative history, the statutory basis step-up provision was not limited to gains or losses realized only on sale or exchange transactions, and the basis step-up generally was applicable to the group contracts terminated in each year.  The District Court explained as follows:

The introductory clause of sec. 1012(c)(3)(A)(ii) articulates that * * * [the basis step-up provision] is to be used "for purposes of determining gain or loss." The statutory text imposes no limit on the kind of gain or loss to which the * * * [basis step-up provision] applies. The common usage of the words "gain or loss," without limitation, plainly includes any gain or loss. * * * Thus, the statutory language at issue, given its ordinary meaning, is plain and unambiguous. * * *

* * * the inconsistency relied on by the United States is created not by the text of statute but by a passage in the legislative history * * *. [Id. at 699.]

We agree with the District Court and with petitioner herein as to the interpretation of TRA 1986 section 1012(c)(3)(A)(ii). We find the statutory language of TRA 1986 to be clear and unambiguous. Reliance on the language in the legislative history to the contrary is not necessary and would not be appropriate other than to understand the purpose of the statute.

Further, the plain meaning of TRA 1986 section 1012(c)(3)(A)(ii) is consistent with the purpose of the statute -- namely, in years after 1986 to allow Blue Cross Blue Shield organizations to avoid tax on appreciation that had occurred in years when such organizations were not subject to Federal income tax.

The limitation on the basis step-up provision sought by respondent would frustrate the above purpose and the overall statutory scheme of TRA 1986 section 1012(c)(3)(A)(ii). An example set forth in petitioner's posttrial brief illustrates this point.

If petitioner sold an office building on January 1, 1994, for a price equal to the building's fair market value on January 1, 1987, petitioner would not realize gain or incur tax on the sale of the building because petitioner would have been allowed to step up the building's tax basis to its January 1, 1987, fair market value.  Under respondent's interpretation, however, if on January 1, 1994, the building was uninsured and was totally destroyed by fire, and if petitioner claimed a deduction under section 165 relating to the casualty loss associated with the fire, petitioner would not be allowed to utilize the January 1, 1987, stepped-up basis in the building because such loss was caused by a fire, not by a sale or exchange.  This latter result (in which petitioner, as a taxable entity for 1994, would be taxed on the pre-1987 appreciation in the building) would be inconsistent with the overall purpose of TRA 1986 section 1012(c)(3)(A)(ii) to not tax such appreciation.[8]

We conclude that the basis step-up provision of TRA 1986 section 1012(c)(3)(A)(ii) applies not just to sale or exchange

_____

[8]  We also note that respondent's legal position is contrary to one of respondent's own legal advice memoranda.  In Tech. Adv. Mem. 95-33-003 (Aug. 18, 1995, and not since revoked or withdrawn), the language of the basis step-up provision of TRA 1986 sec. 1012(c)(3)(A)(ii) is construed by respondent as not limited by the "sale or exchange" language of the legislative history and as including an "abandonment" of computer software.

Also, in Field Service Advice 2000-01-002 (Jan. 7, 2000), respondent reiterated the same legal interpretation of TRA 1986 sec. 1012(c)(3)(A)(ii) and concluded generally that the basis step-up provision was not limited to sale or exchange transactions.

transactions but also to other types of transactions generating losses, such as the contract terminations involved herein.  Our conclusion is supported by a plain reading of TRA 1986 section 1012(c)(3)(A)(ii) and is consistent with and does not frustrate the overall purpose of TRA 1986 section 1012(c)(3)(A)(ii).

The Valuation of Petitioner's
Health Insurance Group Contracts

Before discussing the evidence before us relating to the valuation of petitioner's health insurance group contracts, we discuss legal precedent particularly relevant to the valuation of customer-based intangible assets where tax deductions and losses are claimed with regard thereto.  The court opinions typically frame the issue as whether a taxpayer's evidence, valuation, and (where relevant) useful life determination relating to the intangible assets are adequate to support the separate and discrete tax treatment claimed.  Where the taxpayer's evidence is found to be lacking, the intangible assets may be referred to as "mass assets".

In Houston Chronicle Publg. Co. v. United States, 481 F.2d 1240 (5th Cir. 1973), the Court of Appeals for the Fifth Circuit upheld a District Court's opinion that allowed a newspaper publisher to depreciate the cost of subscription lists that had been purchased from another publisher.  In reaching its conclusion in Houston Chronicle Publg. Co., the Court of Appeals discussed at length and generally rejected the general argument made by the Government therein that the "mass asset" or

"indivisible asset" rule, as a matter of law, prevents

depreciation deductions for customer-based intangible assets

where such assets are linked to goodwill and where the intangible

assets possess some of the same qualities as goodwill. Id. at

1249-1250.

The Court of Appeals, however, provided general guidance as

to the burden of proof where tax deductions relating to

intangible assets are claimed:

> we are convinced that the "mass asset" rule does not
> prevent taking an amortization deduction if the
> taxpayer properly carries his dual burden of proving
> that the intangible asset involved (1) has an
> ascertainable value separate and distinct from
> goodwill, and (2) has a limited useful life, the
> duration of which can be ascertained with reasonable
> accuracy. [Id. at 1250.]

In Newark Morning Ledger Co. v. United States, 507 U.S. 546

(1993), with its purchase of a commercial newspaper, a taxpayer

acquired subscriber contracts. The Supreme Court, before

deciding whether the taxpayer could depreciate the value assigned

to the subscriber contracts, explained the mass asset or

indivisible asset rule and why certain customer-based

intangibles, as a factual matter, may be nondepreciable

thereunder, as follows:

> When considering whether a particular customer-
> based intangible asset may be depreciated, courts often
> have turned to a "mass asset" or "indivisible asset"
> rule. The rule provides that certain kinds of
> intangible assets are properly grouped and considered
> as a single entity; even though the individual
> components of the asset may expire or terminate over

time, they are replaced by new components, thereby causing only minimal fluctuations and no measurable loss in the value of the whole. * * * [Id. at 557.]

The Supreme Court explained further that customer-based intangible assets relating to the expectancy of continued business may be depreciated provided the taxpayer is able to satisfy its evidentiary burden of establishing with reasonable accuracy that the intangible asset is capable of being valued and that the intangible asset diminishes in value over an ascertainable period of time. Id. at 566. Whether taxpayers satisfy this dual burden (affecting the separate tax treatment of discrete customer-based intangible assets) constitutes a question of fact. Id. at 564.

In Newark Morning Ledger Co., because the Supreme Court concluded that the taxpayer therein had satisfied its burden of establishing the value and useful life of the subscriber contracts, the taxpayer was allowed the claimed depreciation deductions for the value assigned to the contracts. The Supreme Court cautioned, however, that with regard to tax deductions relating to customer-based intangibles a taxpayer's burden of proof "often will prove too great to bear." Id. at 566.

In the same Newark Morning Ledger Co. opinion, the Supreme Court made a number of similar statements regarding a taxpayer's evidentiary burden with regard to customer-based intangible assets (in the context of claimed tax deductions relating thereto), quoting in part from earlier court opinions and

emphasizing the importance of the taxpayer's evidentiary basis to support tax deductions relating to customer-based intangible assets (even though some of the referenced opinions allowed the deductions in dispute as did the Supreme Court in Newark Morning Ledger Co.).  We quote below these additional statements from the Supreme Court's opinion in Newark Morning Ledger Co.:

(1) "The courts that have found these assets depreciable have based their conclusions on carefully developed factual records."  * * *  [Id. at 560];

(2) "The * * * [Court of Claims in Richard S. Miller & Sons, Inc. v. United States, 210 Ct.Cl. 431, 537 F.2d 446 (1976)] concluded that the taxpayer had carried its heavy burden of proving that the expirations had an ascertainable value separate and distinct from goodwill and had a limited useful life * * *."  [Id. at 560];

(3) "The Tax Court [in Citizens & S. Corp. v. Commissioner, 91 T.C. 463 (1988), affd. 919 F.2d 1492 (11th Cir. 1990)] rejected the Commissioner's position, concluding that the taxpayer had demonstrated with sufficient evidence that the economic value attributable to the opportunity to invest the core deposits could be (and, indeed, was) valued * * *." [Id. at 562];

(4) "The * * * [Tax Court in Co. Natl. Bankshares v. Commissioner, T.C. Memo. 1990-495, affd. 984 F.2d 383 (10th Cir. 1993)] specifically found that the deposit accounts could be identified; that they had limited lives that could be estimated with reasonable accuracy; and that they could be valued with a fair degree of accuracy."  * * *  [Id. at 563];

(5) "The Court of Appeals [in Newark Morning Ledger Co. v. United States, 945 F.2d 555 (3d Cir. 1991), revd. 507 U.S. 546 (1993)] concluded further that in 'the context of the sale of a going concern, it is simply often too difficult for the taxpayer and the court to separate the value of the list qua list from the goodwill value of the customer relationships/structure.' [Id. at 568.]  We agree with that general observation.  It is often too difficult for taxpayers to separate depreciable intangible assets from goodwill.  But sometimes they manage to do it.  And whether

or not they have been successful in any particular case is a question of fact." [Id. at 564];

(6) "Although we now hold that a taxpayer able to prove that a particular asset can be valued and that it has a limited useful life may depreciate its value over its useful life regardless of how much the asset appears to reflect the expectancy of continued patronage, we do not mean to imply that the taxpayer's burden of proof is insignificant." * * * [Id. at 566].

Subsequent to the Supreme Court's 1993 opinion in Newark Morning Ledger Co. v. United States, supra,[9] court opinions consistently have made similar statements and consistently have placed a heavy burden on taxpayers seeking tax deductions relating to intangible assets. In Ithaca Indus., Inc. v. Commissioner, 17 F.3d 684 (4th Cir. 1994), affg. 97 T.C. 253 (1991), the Court of Appeals for the Fourth Circuit explained that the Supreme Court's holding in Newark Morning Ledger Co. "subsumes the mass asset rule under a broader inquiry aimed at determining whether the asset can be valued". Id. at 688 n.8. "[M]ost of the cases purporting to apply the 'mass asset' rule involve evidentiary failures on the part of the taxpayer". Id. at 689 n.11 (quoting Houston Chronicle Publg. Co. v. United States, 481 F.2d at 1249).

---

[9] We note generally that in 1993 sec. 197 was added to the Code to allow for amortization of goodwill and other intangible assets (including customer-based intangibles) purchased after Aug. 10, 1993. Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(g), 107 Stat. 312, 540. Sec. 197, however, expressly excludes most self-created intangible assets from amortization treatment thereunder, and petitioner herein makes no argument that it should be entitled under sec. 197, for 1994 or any other year, to amortize any cost basis in the group contracts.

In Globe Life & Accident Ins. Co. v. United States, 54 Fed. Cl. 132 (2002), the Court of Federal Claims explained that in order for a taxpayer to be entitled to amortization deductions relating to intangible assets, the taxpayer would have to prove:

> (1) that the asset wastes over time, including that the asset is not a regenerating mass asset;
>
> (2) a reasonably accurate estimate of the period in which the asset wastes, meaning the asset's useful life; and
>
> (3) a reasonably accurate estimate of the value of the asset over its useful life. A taxpayer's failure to prove any of the three prongs is fatal to its claim. [Id. at 136.]

In FMR Corp. & Subs. v. Commissioner, 110 T.C. 402 (1998), in disallowing amortization deductions relating to expenditures incurred in launching a number of regulated investment companies, we explained that the availability of an amortization deduction relating to an intangible asset "is primarily a question of fact" with the taxpayer bearing the burden of proof. Id. at 430 (citing Newark Morning Ledger Co. v. United States, 507 U.S. at 560, 566).

In Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406 (1994), in disallowing claimed amortization deductions relating to an employment contract, we explained that the taxpayer's burden of proof was "not insignificant and 'that burden often will prove too great to bear.'" Id. at 436 (quoting in part Newark Morning Ledger Co. v. United States, supra at 566).

In Turner Outdoor Adver., Ltd. v. Commissioner, T.C. Memo. 1995-227, in concluding that a group of leasehold interests did not constitute a depreciable intangible asset, we explained that "The critical question is the overall value of the leasehold interests, and that amount must be shown with 'reasonable accuracy'." Id. (quoting in part Newark Morning Ledger Co. v. United States, supra at 566).

Some further discussion is appropriate with regard specifically to claimed section 165(a) loss deductions relating to intangible assets. Section 165(a) allows an ordinary deduction for a business loss sustained during a year where the loss is not compensated for by insurance or otherwise. The amount of a loss deduction under section 165(a) is limited to the taxpayer's adjusted tax basis in the asset lost. Sec. 165(b).

The relevant regulations under section 165 make it clear that loss deductions are allowable not just for losses relating to tangible, depreciable property, but also for losses relating to nondepreciable property. Section 1.165-2(a), Income Tax Regs., provides in part as follows:

> A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. * * * [Emphasis added.]

Generally, to be entitled to loss deductions under section 165(a) the losses must be evidenced by closed and completed transactions, fixed by identifiable events, and sustained during the year in which the deductions are claimed. Sec. 1.165-1(b), (d), Income Tax Regs. As explained in United Dairy Farmers, Inc. v. United States, 267 F.3d 510 (6th Cir. 2001), the event that identifies the loss of an asset "must be observable to outsiders and constitute 'some step which irrevocably cuts ties to the asset.'" Id. at 522 (quoting Corra Res., Ltd. v. Commissioner, 945 F.2d 224, 226-227 (7th Cir. 1991), affg. T.C. Memo. 1990-133); JHK Enters., Inc. v. Commissioner, T.C. Memo. 2003-79.

In A.J. Indus., Inc. v. United States, 503 F.2d 660, 664 (9th Cir. 1974), the Court of Appeals for the Ninth Circuit, citing section 1.165-1(b) and (d), Income Tax. Regs., stated that "A loss is not sustained and is not deductible because of mere decline, diminution or shrinkage of the value of property".

A number of court opinions decided prior to the Supreme Court's opinion in Newark Morning Ledger Co. v. United States, supra, involved loss deductions claimed under section 165 and attempted valuations of customer-based intangible assets, and we believe them still to have relevance in the context of the instant case.

In Skilken v. Commissioner, 420 F.2d 266 (6th Cir. 1969), affg. 50 T.C. 902 (1968), upon its purchase of a vending machine business, a taxpayer purchased contract rights for the placement of cigarette vending machines on different properties. These

contract rights were terminable at will and were affected by the taxpayer's ongoing relationship with the owners of the properties on which the vending machines were located. Id. at 267.

The Court of Appeals for the Sixth Circuit concluded, among other things, that because the taxpayer in Skilken v. Commissioner, supra, had not valued each contract right separately no loss deduction was allowable. Id. at 270-271. The Court of Appeals was not persuaded by the fact that the taxpayer's valuation method represented a recognized method in the industry for valuing contract rights associated with a vending machine business. The Court of Appeals stated as follows:

> The rule of thumb employed by [the] taxpayer no doubt is an accurate reflection of the average value of vending machine locations in such circumstances. It is not an accurate reflection, however, of the value of any particular location. * * * [Id. at 270.]

In Sunset Fuel Co. v. United States, 519 F.2d 781 (9th Cir. 1975), a taxpayer purchased from a distributor of fuel oil a group of customer accounts. The taxpayer valued each account based on a formula of 4 cents for each gallon of fuel oil purchased by the customer during the prior 12-month period. As individual customers canceled their accounts with the taxpayer, the taxpayer claimed loss deductions under section 165 based on the above valuation formula. Id. at 782. Because the taxpayer did not adequately establish a basis in each separate account, the court denied the claimed loss deductions under section 165

relating to the cancellation of the individual customer accounts. The Court of Appeals for the Ninth Circuit explained as follows:

> the indivisible asset rule prevents a loss deduction when the nature of the purchased asset is such that individual accounts cannot be accurately valued.  A taxpayer must be able to establish reasonably accurately a basis in the particular account on which the loss is claimed.  Segregating out the goodwill is only the first step.  The taxpayer must then prove the portion of the total purchase price allocable to the particular account lost.  * * *  [Id. at 783.]

The Court of Appeals in Sunset Fuel Co. concluded that the taxpayer's "rule of thumb" valuation of assets for loss deduction purposes was inadequate and that loss deductions had to be based on the value of the separate assets.  The court explained further:

> The * * * [value] of a particular account is a function of the [expected] flow of future income * * * discounted by the risk of discontinuance or nonpayment of that particular account * * * a risk peculiar to each account depending on the nature of the customer and his future plans and prospects.  Application of the indivisible asset rule reflects the fact that, when a relatively fungible mass of accounts is purchased, the taxpayer cannot determine the value of each account and establish a basis in it, but rather determines the value of the whole using some rule of thumb technique which discounts the income to be expected from the whole by the risk of discontinuance [which] experience has indicated inheres in the mass as a whole (thereby averaging out the unique and indeterminable risks of each account).  [Id. at 783-784; fn. ref. omitted.]

In Ralph W. Fullerton Co. v. United States, 381 F. Supp. 1353 (D. Or. 1974), affd. 550 F.2d 548 (9th Cir. 1977), a taxpayer purchased a group of insurance accounts as part of its

purchase of an ongoing general insurance agency. The taxpayer argued that the group of insurance accounts constituted separate assets with respect to which loss deductions under section 165 should be allowed as the accounts were terminated in amounts equal to the alleged cost of the accounts. Id. at 1354. The court concluded that because the taxpayer failed to make an adequate factual showing that it had valued each customer account separately, no loss deductions were allowable on termination of the separate contracts. Id. at 1355.

In affirming the District Court's decision, the Court of Appeals for the Ninth Circuit in Ralph W. Fullerton Co. v. United States, 550 F.2d 548 (9th Cir. 1977), concluded that the formula used by the taxpayer was designed to value the aggregate and was inadequate to value separate accounts. The court stated as follows:

> valuation of customer accounts by resort to a formula applied indiscriminately to all accounts does not sufficiently establish the portion of the purchase price allocable to the individual accounts so as to avoid application of the mass asset rule. Indeed, resort to a formula * * * [is] an indication that the individual value of the accounts cannot satisfactorily be ascertained. * * * [Id. at 550 (citing Sunset Fuel Co. v. United States, supra).]

As indicated, supra, recently in Trigon Ins. Co. v. United States, 215 F. Supp. 2d 687, 720 (E.D. Va. 2002), claimed losses relating to health insurance group contracts similar to those involved herein were not allowed because the taxpayer had not

adequately established the fair market value (i.e., basis) of its health insurance group contracts as of January 1, 1987.

In regard to the nature of the evidence needed to establish the amount of loss deductions under section 165, Mertens, Law of Federal Income Taxation, provides generally as follows:

> Often, in proving the amount of actual loss, the taxpayer must demonstrate not only the value of what the taxpayer may have left after the loss but his cost or other basis in the item on which loss is sustained. This phase of the problem requires essentially a factual demonstration. Estimates and crude approximations are not sufficient. [7 Mertens, Law of Federal Income Taxation, sec. 28.04, at 25 (2001 rev.); fn. ref. omitted.][10]

---

[10] The concept that different valuation contexts may call for different valuation approaches is not a novel or new proposition. As stated in a leading valuation treatise: "an asset's value for one federal tax purpose may be different from its value for another federal tax purpose." Bogdanski, Federal Tax Valuation, par. 2.03, at 2-169 (1996). An asset's value may differ depending on the valuation context because "both the concepts of value and the technique of its proof are decidedly influenced by the specific purpose for which the valuation is made." 1 Bonbright, The Valuation of Property, at 4-5 (photo. reprint 1965) (1937); see also, Smith & Parr, Valuation of Intellectual Property and Intangible Assets, ch. 5, at 140-142 (2d ed. 1994) (the value of an asset may be impacted by the underlying purpose for the valuation of the asset).

Courts have recognized that in the estate tax context the valuation approach used to calculate the value of a gross estate (e.g., a grouping of the assets together) may be different from the approach used to calculate the value of a deduction from the gross estate. Ahmanson Found. v. United States, 674 F.2d 761 (9th Cir. 1981); Estate of Chenoweth v. Commissioner, 88 T.C. 1577 (1987). In Ahmanson Found., the Court of Appeals for the Ninth Circuit stated as follows:

> there are compelling considerations in conflict with the initially plausible suggestion that valuation for

(continued...)

[10](...continued)
purposes of the gross estate must always be the same as valuation for purposes of the charitable deduction. When the valuation would be different depending on whether an asset is held in conjunction with other assets, the gross estate must be computed considering the assets in the estate as a block. * * * The valuation of these same sorts of assets for the purpose of the charitable deduction, however, is subject to the principle that the testator may only be allowed a deduction for estate tax purposes for what is actually received by the charity -- a principle required by the purpose of the charitable deduction. [Ahmanson Found. v. United States, supra at 772.]

See also Estate of Chenoweth v. Commissioner, supra at 1589, where an asset was to be valued differently for gross estate purposes than it was to be valued for marital deduction purposes; and see 15 Mertens, Law of Federal Income Taxation, sec. 59.54, at 154 (2002 rev.), which provides as follows:

for estate tax valuation purposes a block of stock may be treated as a single controlling block of stock, even though the block is bequeathed to the decedent's survivors and his spouse in separate parts. * * * However, for purposes of the estate tax marital deduction valuation, the portion of the same decedent's interest in the company that passes to his surviving spouse should be treated as a separate minority interest and discounted accordingly. [Fn. refs. omitted.];

and Lavoie, 831-2d Tax Mgmt. (BNA), "Valuation of Corporate Stock", at A-62 (1998), which provides as follows:

If a decedent dies owning a controlling interest in a corporation, then the stock is valued as a controlling interest irrespective of the number or identity of the decedent's legatees. However, per share value determined for purposes of inclusion in the decedent's gross estate does not necessarily control the value assigned to shares for purposes of determining allowable deductions to the estate. * * * [Fn. ref. omitted.]

and further with regard specifically to loss deductions and intangible assets, Mertens provides:

> When an asset is composed of individual accounts which cannot be accurately valued, the asset is treated as an indivisible asset and termination of any individual account merely diminishes the value of the indivisible asset. Unless the taxpayer can prove with reasonable accuracy the basis in the particular account lost, the indivisible asset rule prohibits a loss deduction, since the requirement that the loss be evidenced by a closed and completed transaction is not met. * * *
> [7 Mertens, Law of Federal Income Taxation, sec. 28.15, at 49-50 (2001 rev.).]

Petitioner herein acknowledges that loss deductions under section 165(a) are allowable only on an asset-by-asset basis, not on the basis of some cumulative diminution in the fair market value of an aggregate group of assets of which the lost asset is a part. Accordingly, petitioner agrees that under section 165(a) it is only the amount of a taxpayer's specific tax basis in separate and discrete assets that constitutes an allowable loss deduction. Accordingly, petitioner argues, as indeed it must, that the $4 million (in claimed loss deductions for 1994 relating to petitioner's group contracts) represents the cumulative total of 376 separate loss deductions, reflecting the cumulative total stepped-up January 1, 1987, tax basis in each of petitioner's 376 group contracts.[11]

_____

[11] In the instant case, with regard specifically to the burden of proof and particularly to the difference between the
(continued...)

The task of resolving the fact issue as to the fair market value of petitioner's separate health insurance group contracts is complicated by petitioner's pre-1987 history as a nontaxable entity, during which years petitioner's tax basis in and the fair market value of petitioner's health insurance group contracts were not relevant and were not recorded on petitioner's books and records. This task is also complicated by the provisions of the basis step-up provision of TRA 1986, under which it was anticipated that taxpayers who thereby became taxable would go through a process of identifying their assets, of making fair market valuations of those assets as of January 1, 1987, and of

---

[11](...continued)
$2,648,249 in loss deductions originally claimed on petitioner's 1994 corporate Federal income tax return and the $4 million in loss deductions raised by petitioner at trial relating to petitioner's 376 group contracts, petitioner agrees that the burden of proof herein is on petitioner. Rule 142(a).

With regard, however, to the $2,648,249 in loss deductions relating to the 376 group contracts that were claimed on petitioner's original 1994 corporate Federal income tax return, petitioner asserts that respondent, in the notice of deficiency, did not raise the factual valuation issue as a ground for the disallowance of the claimed losses (i.e., whether petitioner, for loss deduction purposes, adequately valued the 376 group contracts). Petitioner therefore argues that respondent, rather than petitioner, herein should have the burden of proof as to the factual valuation issue to the extent of the $2,648,249 in loss deductions claimed on petitioner's original 1994 corporate Federal income tax return. Rule 142(a)(1).

We disagree. In disallowing the total $2,648,249 in loss deductions claimed on petitioner's original 1994 corporate Federal income tax return, respondent's notice of deficiency, among other things, used broad language relating to whether petitioner sustained "any loss", which language we believe in this case includes the factual valuation issue.

recording and reflecting those fair market valuations on their tax books and records on an asset-by-asset basis.

Herein, as explained, such a valuation of petitioner's health insurance group contracts was not attempted until sometime in 1995, 8 years after enactment of TRA 1986, which 1995 valuation was then discarded by petitioner and replaced with an unexplained valuation done in 2001 and later by a valuation done in 2003. The 2003 valuation on which petitioner now relies was not completed until 16 years after the relevant valuation date.

Further complicating the matter before us is the fact that the health insurance group contracts at issue herein constitute "customer-based" intangible assets of a type that, as discussed above, are particularly difficult to categorize and to value, to distinguish from a taxpayer's goodwill, and that over the years have been the subject of difficult litigation.

Petitioner argues that its 23,526 health insurance group contracts constituted separate, discrete assets that may be and that were valued separately as of January 1, 1987, and that we should accept petitioner's $131,697,202 cumulative total valuation for the 23,526 group contracts in effect on January 1, 1987, and petitioner's $4 million cumulative total valuation for the 376 group contracts terminated in 1994, and that we should allow petitioner the total $4 million in loss deductions claimed.

Respondent argues that petitioner's valuation of the 376 group contracts is deficient, that it is based on a methodology that effectively and improperly values the 376 group contracts as

part of a block rather than as separate assets, and that it fails to take into account discrete characteristics of each group contract, and therefore that the group contracts should be treated as an indivisible mass asset ineligible for the loss deductions claimed.

We have considered carefully the above court opinions, and we have reviewed carefully the parties' arguments, expert witness reports, and expert witness testimony. Based on that consideration and review, we conclude that petitioner's valuation of its health insurance group contracts is inadequate and does not properly and credibly establish a discrete January 1, 1987, value (and therefore a tax basis for loss deduction purposes) for the 376 separate group contracts. Petitioner is not entitled to the claimed total $4 million in loss deductions under section 165 relating to the 376 group contracts terminated in 1994.

The valuation of petitioner's health insurance group contracts by petitioner's expert was inadequate for a number of reasons. Petitioner's expert derived his value for petitioner's health insurance group contracts by treating all of petitioner's 23,526 group contracts in effect on January 1, 1987, as if they were sold by petitioner together as a group in a hypothetical reinsurance transaction. In this hypothetical, a buyer would acquire from petitioner the right to premiums, the risk, and the liabilities associated with all 23,526 group contracts, with petitioner (in exchange for a fee to be paid by the buyer to petitioner) continuing to service all of the group contracts

under petitioner's existing name.  Under this reinsurance model used by petitioner's expert, petitioner's 23,526 group contracts effectively were valued together as a mass and not as distinct assets separate from each other and from petitioner's other intangible assets.

In his valuation, petitioner's expert utilized incomplete information and either ignored, improperly applied, or made incorrect assumptions about unique characteristics associated with petitioner's group contracts.

In his analysis of the life of petitioner's health insurance group contracts, petitioner's expert incorrectly assumed a 20-year useful life for all of petitioner's separate health insurance group contracts, and he incorrectly assumed that lapse rates for the group contracts would be consistent with certain outdated information.

We explain further the key aspects of petitioner's expert's valuation of the group contracts with which we disagree.[12]

Reinsurance Model

The reinsurance model used by petitioner's expert values petitioner's 376 group contracts that were terminated in 1994 and

---

[12]  In the instant case, because petitioner went to some significant effort to cure the item by item valuation deficiencies that the District Court detailed in its opinion in Trigon Ins. Co. v. United States, 215 F. Supp. 2d 687 (E.D. Va. 2002), supplemented at 234 F. Supp. 2d 581 (E.D. Va. 2002), our criticisms of petitioner's valuation of the group contracts are more general than those of the District Court in Trigon Ins. Co., but they are equally fatal to petitioner's claimed loss deductions.

that are in issue in this case as if the 376 contracts were sold in a reinsurance transaction that occurred on January 1, 1987, as part of a larger sale for $131.7 million of all 23,526 of petitioner's group contracts in effect on that date.

In treating the 376 group contracts as if they were sold together in one transaction, along with the balance of petitioner's 23,526 group contracts, petitioner's expert erroneously minimizes the risk inherent in each separate group contract, maximizes the value of petitioner's group contracts, and, for loss deduction purposes, overstates their value. Petitioner's expert's $131.7 million reflects the cumulative total value of petitioner's 23,526 group contracts as a whole, and the expert appears to include therein the value of petitioner's other intangible assets (e.g., goodwill, trade name, and provider network).

Petitioner's expert acknowledged that under his method he valued petitioner's group contracts in a way that reflected more than just the value of each separate group contract. In his report and testimony, petitioner's expert states as follows:

> as in the case of most intangible assets, the value of group health insurance contracts can be realized in a market transaction where the contracts are transferred together with other assets. In this case, the hypothetical market transaction to realize that value could be a transfer that includes all of * * * [petitioner's] assets, including such assets as the provider network. As I indicated earlier, a hypothetical market transaction that realizes the full economic value of the contracts could be structured as a sale by reinsurance.

Q: Now, in making your assumption in assuming this reinsurance transaction, did you assume that the contracts, in fact, would be sold one at a time?

A: No. In fact, I would think that would be quite unlikely, for the most part.

* * * I anticipate that somebody in the insurance business who would be an interested buyer of this business would wish to buy in bulk.

Petitioner's expert asserts that under his reinsurance model the value (calculated for and assigned to each of petitioner's 376 group contracts that terminated in 1994) would be the same whether the hypothetical sale constituted a sale of all 23,526 of petitioner's group contracts or constituted a sale of just the 376 group contracts that terminated in 1994. According to petitioner's expert, the 376 group contracts in issue would themselves constitute a "credible" block (i.e., the expected income flow from the group would not be affected significantly by fluctuations in claims experience within the block).

As noted however, and as it must, petitioner does not claim a single loss deduction in 1994 upon the termination of the 376 group contracts. Rather, petitioner claims 376 separate loss deductions relating to the termination of each of the 376 separate group contracts. What is required to support petitioner's claimed loss deductions under section 165 are valuations of the group contracts that reflect a value for each contract as a separate and discrete contract.

In this regard, the District Court in Trigon Ins. Co. v. United States, 215 F. Supp. 2d at 709, stated as follows:

the issue is not whether the highest and best use of
* * * [the taxpayer's group] contracts is as part of an
ongoing health insurance company.  Indeed, that is the
only use of the contracts.  The issue, instead, is
whether specific contracts can be valued separately
from the block of contracts to which they belong.

To account for intangible assets such as goodwill that were associated with the group contracts and that were not lost upon termination in 1994 of just 376 of the group contracts, petitioner's expert claims that (rather than make a capital charge to account for and to carve out the appropriate value of the other intangible assets) he made some type of vague expense adjustment.  Petitioner's expert's explanation for failing to make a capital charge for the value of other intangible assets associated with the 376 group contracts is not credible. Petitioner's expert's valuation does not properly value and carve out from the valuation of the 23,526 group contracts, nor does it separate from the value of the 376 group contracts in issue, the value of related but nonterminated intangible assets such as goodwill.

In summary, by treating the 376 group contracts in issue as if they were sold in a reinsurance transaction involving a package of all 23,526 group contracts, petitioner's expert effectively lumps all of petitioner's group contracts together and values the group contracts as a block.  This approach is contrary to petitioner's position that for loss deduction purposes the 376 group contracts that were terminated in 1994 were properly and discretely valued.  In other words, all

petitioner has done is establish that the group contracts are capable of being valued in blocks. Petitioner has not, however, established that the group contracts are capable of being valued separately and independently as individual assets.[13]

Contract Characteristics

Even if petitioner's expert's valuation model (namely, a reinsurance transaction involving all 23,526 group contracts) were to be regarded as a proper model for the valuation for loss deduction purposes of petitioner's 376 group contracts terminated in 1994, petitioner's expert utilized incomplete information and made erroneous assumptions relating to the characteristics of the group contracts that alone would support disallowance of the $4 million in loss deductions claimed.

First, with regard generally to all of petitioner's group contracts (both community rated and experience rated), petitioner's expert: (1) Ignored or did not consider historical premium payment and claim patterns and renewal expectations

---

[13] We note that the appendices to the valuation report of petitioner's expert list separate dollar amounts for each of petitioner's 23,526 group contracts in effect on Jan. 1, 1987. The amount shown for each contract, however, was calculated by petitioner's expert based on a valuation methodology and assumptions that relied on the attributes and characteristics of all of petitioner's group contracts rather than the attributes and characteristics of each contract as a separate and discrete asset. This is not to say that petitioner's expert assigned to each of the 23,526 group contracts the same dollar amount based solely on a pro rata share of petitioner's expert's $131.7 million cumulative total valuation. The dollar amount calculated by petitioner's expert for each of the group contracts reflected only limited contract-specific characteristics.

relating to each contract; (2) improperly applied average premium rates to a number of group contracts with respect to which he lacked premium data; and (3) improperly assumed that over time there would be neither growth nor decline in the member size of each group.

Another of petitioner's experts (petitioner's second expert) discussed the importance of petitioner's knowing and understanding the historical premium payment and claim patterns and the expectation of renewal for each separate group contract. In comparing the relationship between an insurance company and its individual and group customers to the relationship between a general service provider such as a fast-food restaurant or a supermarket and its customers, petitioner's second expert stated that an insurance company has a personal relationship with each of its customers while a general service provider has a relationship with its customer base as a whole. According to petitioner's second expert, this distinction is due, in part, to the insurance company's knowledge and information about the unique characteristics of each of its customers including the historical premium payment and claim patterns for each customer and information regarding the likelihood that each customer will or will not renew its contract with the insurance company.

Had petitioner's valuation been undertaken at a time more proximate to the January 1, 1987, valuation date, it is likely that important information relating to the particular

characteristics of each group contract would have been available for use in the valuation of the group contracts.

In order for the valuation of petitioner's health insurance group contracts to reflect a discrete value for each group contract, the premium payment and claim patterns and the information relating to renewal expectations for the separate contracts were necessary and should have been available for use by petitioner's expert in the valuation.

Of petitioner's 11,070 group contracts involving basic medical and/or basic hospital coverage in effect on January 1, 1987, petitioner lacked information regarding premium rates on 9,288 of the group contracts. In light of this missing information, petitioner's expert derived an average premium rate from petitioner's 1,782 group contracts involving basic medical and/or basic hospital coverage for which petitioner did have available premium rate information. These 1,782 group contracts with premium rate information consisted of both community-rated and experience-rated group contracts and varied in benefit type between individual, parent with children, and family. The monthly premiums for these contracts ranged from a low of $29.83 to a high of $115.79. From these 1,782 group contracts involving basic medical and/or basic hospital coverage, petitioner's expert derived his average monthly premium rate of $55.42.

Petitioner's expert then assumed that each of the 9,288 group contracts involving basic medical and/or basic hospital coverage with respect to which petitioner lacked premium

information had the same average monthly premiums regardless of the type of benefit or whether the contracts constituted community or experience-rated contracts.

Valuing approximately 40 percent of all of petitioner's group contracts (9,288 divided by 23,526 equals 40 percent) using an average premium rate reflects the lack of contract-specific information available to petitioner's expert and the aggregate valuation methodology used by petitioner's expert.

Petitioner's expert also assumed that for each of petitioner's health insurance group contracts in effect on January 1, 1987, the average number and the makeup of the individual members covered under each group contract would remain constant throughout the 20-year useful life period that he used for each contract.  His assumption, however, was incorrect.  For example, after downsizing its business, one of petitioner's groups that was enrolled with petitioner in 1989 with 200 members later reenrolled with petitioner in 1992 with a group size of just 32 members.

The assumption regarding group size significantly affected petitioner's expert's valuation of the group contracts.  As noted by one of respondent's experts, a mere 1-percent decline in the total member enrollment relating to petitioner's group contracts would reduce the present value of all 23,526 group contracts by approximately 15 percent.

With regard specifically to petitioner's community-rated group contracts, petitioner's expert valued these contracts using

average claims and expense ratios. By applying average claims and expense ratios to petitioner's community-rated group contracts, petitioner's expert fails to account for the characteristics of individual members of each group such as age, gender mix, number of persons covered, family composition, occupation, differing health conditions, and historical claims experience unique to the individuals and families covered by each group contract.

We note that petitioner's experts acknowledged that specific characteristics unique to each community-rated group contract and its members would be considered important by petitioner's competitors in any attempt to obtain (by purchase or otherwise) discrete community-rated group contracts.

Further, the use by petitioner's expert of average claims and average expense ratios for community-rated group contracts explains why he treats each community-rated group contract as profitable. For example, use of a claims ratio just 1 percent higher than the aggregate average claims ratio used by petitioner's expert for community-rated group contracts would reduce petitioner's projected profit relating to the contracts by more than half. Petitioner's expert treats the average community-rated group contract as profitable, and he treats each community-rated group contract as profitable.

Turning to petitioner's experience-rated group contracts, petitioner's expert again assumes that all of the experience-rated group contracts had the same profit margin and that

petitioner was realizing losses on none of the experience-rated group contracts. In explanation, petitioner's expert notes that the experience-rated group contracts had reserve mechanisms that allowed petitioner potentially to recoup losses relating to particular experience-rated group contracts. Petitioner, however, was not insulated from losses relating to experience-rated group contracts, and every experience-rated group contract could produce an unrecoverable loss for petitioner. The retrospective credit contracts could be terminated by the groups at will even if they had a deficit account, and petitioner could only recoup a shortage with respect to its retrospective refund contracts if the contracts produced excess premiums in subsequent years.

By not taking into account contract-specific characteristics relating to experience-rated group contracts, petitioner's expert concluded that the average experience-rated group contract would not experience a loss, and his valuation did not reflect or identify which experience-rated group contracts should be so treated as loss contracts and valued accordingly.

The error of petitioner's expert's approach in this regard is illustrated by an example involving Pennsylvania Farmer's Union, and facts that generally postdate January 1, 1987, but that nevertheless illustrate the problem with petitioner's valuation approach. As of January 1988, Pennsylvania Farmer's Union maintained with petitioner three experience-rated, retrospective credit group contracts with a cumulative deficit of

approximately $700,000.  By early 1994, the cumulative deficit had reached $4 million, and petitioner had proposed a 48-percent rate increase to take effect the following year.  Pennsylvania Farmer's Union did not accept the rate increase proposed by petitioner, and its group contracts with petitioner were terminated in 1994.

In spite, however, of the millions of dollars in deficits that petitioner had incurred relating to the three Pennsylvania Farmers' Union group contracts (particularly the $568,000 cumulative deficit that had built up in 1988 and prior years), petitioner's expert assigned the three Pennsylvania Farmer's Union contracts a total positive value of $479,000, or nearly 20 percent of the total value attributed to all of petitioner's experience-rated group contracts that were terminated in 1994.

Lifing Analysis

In establishing the future income stream for the group contracts, petitioner's expert undertook a lifing analysis of petitioner's group contracts in which he, in present value terms, set forth the after tax income he expected petitioner's 23,526 group contracts to generate over the course of 20 years (1987-2006).

In his lifing analysis of petitioner's group contracts, in his attempt to account for the reality that not all of petitioner's group contracts would remain in existence for 20 years, petitioner's expert utilized historical lapse rates relating to a sample of petitioner's group contracts that

terminated between 1982 and 1986, which indicated that each group contract had a 2.2-percent to 7.5-percent probability of lapsing from year to year, depending on factors such as group size and duration of the contract.

The lapse rates utilized by petitioner's expert, however, do not account for foreseeable, as of January 1, 1987, and significant changes in the health insurance marketplace that were imminent and about to impact petitioner's business and that constituted significant factors affecting the life and value of petitioner's health insurance group contracts.

As explained, by the mid-1980s, the national health insurance marketplace had become increasingly competitive with escalating health care costs, the emergence of new health care products, and the continued growth of alternative health care product delivery services such as HMOs, PPOs, and plans administered by third party administrators.

As evidenced by the following quotation from petitioner's 1985 Annual Report, by the mid-1980s petitioner's management was aware that new health insurance products and new marketing techniques were creating an increasingly competitive health insurance industry:

> We are witnessing the emergence of a new competitive market in the delivery and financing of health care services. During 1985 the once clear line of demarcation between the financing and the delivery of health care continued to fade. In Central Pennsylvania and the Lehigh Valley new competition emerged -- not just from insurance companies and third-party administrators, but from Health Maintenance

Organizations (HMOs), Preferred Provider Organizations (PPOs), and other new delivery and financing schemes.

Many of these new competitors are sponsored by or joint ventures with the doctors and hospitals who also provide care. This fading of the line between financing and delivery represents a major turning point for our industry. It creates a challenge to all of the traditional assumptions about our business.

Minutes of petitioner's 1986 corporate planning meeting state as follows:

The Plan will continue to face competition from new entities, e.g., self insurance, TPA's, HMO's and PPO's. As this competition increases Capital Blue Cross must protect against cost shifting and adverse selection and become responsive to a changed marketplace.

* * * Greater efforts will be made by commercial carriers to increase their share of the market. These carriers who are able to provide life, health, accident, etc., will be in an advantageous position by being able to provide wide-ranging benefits.

By basing the lapse rates for his lifing analysis of petitioner's group contracts on 1982-1986 lapse rate information relating to petitioner's group contracts, petitioner's expert largely ignored the industry changes of which petitioner's management, as of January 1, 1987, was aware. Any valuation of petitioner's group contracts should have considered the changes occurring in the insurance marketplace as of January 1, 1987.

Further and significantly, because petitioner's group contracts were effectively terminable at will, petitioner's customers could cancel their contracts with petitioner for any number of reasons, making the realistic useful life or duration of petitioner's health insurance group contracts directly

impacted by what is referred to as "human elements". These human elements associated with petitioner's group contracts created a significant element of unpredictability with regard to the useful life of petitioner's group contracts.

Various courts have commented on the difficulties presented when such human elements are associated with the valuation of intangible assets. In Ithaca Indus., Inc. v. Commissioner, 17 F.3d at 689-690, the Court of Appeals for the Fourth Circuit concluded that the taxpayer was not allowed to amortize the value of its employee workforce due in large part to the human elements associated with employee behavior.

In Globe Life & Accident Ins. Co. v. United States, 54 Fed. Cl. 132 (2002), the Court of Federal Claims held that the claimed value of a group of insurance agents was not subject to amortization due to the many variables involved in attempting to determine the useful life of an intangible asset that is directly tied to human relations. Id. at 139.

Petitioner's expert did not adequately take into account these human elements. Indeed, there is not a single clear reference in his valuation report relating to the human elements to be taken into account in the valuation of petitioner's health insurance group contracts. One vague reference thereto comments simply that "It is not possible to predict when any particular group contract will lapse."

By valuing all 23,526 of petitioner's group contracts based on a useful life of 20 years, petitioner's expert implicitly

ignores the human elements associated with the group contracts and whether they will be renewed or terminated by the group sponsors.

## Conclusion

Petitioner is not entitled to the claimed $4 million in loss deductions relating to the 376 health insurance group contracts that were terminated in 1994.

<u>Decision will be entered</u>

<u>for respondent</u>.